**UNITED STATES of America,
Plaintiff,**

v.

**Guss POLITES, Defendant.
Civ. No. 11820.**

United States District Court,
E. D. Michigan, S. D.
Aug. 13, 1953.

aside the order granting American citizenship to defendant Guss Polites the 6th day of April, 1942, pursuant to Section 338(a) Nationality Act of 1940, 54 Stats. 1158, Section 738(a), U.S.C.Title 8.[1]

The action is based generally on the sworn petition defendant Polites filed October 6, 1941, under Section 310(b), Nationality Act of 1940, 54 Stats. 1144 (b),[2] that:

(1) He was not and had not been for the period of at least ten years immediately preceding date thereof "an anarchist; nor a believer in unlawful damage, injury or destruction of property, or sabotage, nor a disbeliever in or opposed to organized government;" and

(2) He was " * * * attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." Sec. 307(a) (3) Nationality Act of 1940.[3]

Narrowed down, however, three grounds are advanced:

(1) That the naturalization was illegal because defendant in his petition stated that he was not, and had not been for at least ten years immediately preceding his filing said petition, member of any organization that "advises, advocates, or teaches the overthrow by force or violence of the Government of the United States", Section 305, Nationality Act of 1940, 54 Stats. 1141.[4]

Frederick Kaess, U. S. Dist. Atty., Dwight K. Hamborsky, Asst. U. S. Atty., and Joseph Sureck, U. S. Immigration and Naturalization Service, Detroit, Mich., for plaintiff.

Ernest Goodman, Goodman, Crockett, Eden & Robb, Detroit, Mich., for defendant.

PICARD, District Judge.

This is a suit brought by the United States of America to revoke and set

(2) That citizenship was gained by fraud in that said defendant denied that he had ever been a member of any organization advising, advocating or teaching overthrow of the government of the United States by force or violence, knowing that the Communist Party of the U. S. to which he belonged from 1933 to 1941 did so advise, advocate or teach; and

(3) That he committed fraud when he took the oath of allegiance. Section

1. Now 8 U.S.C.A. § 1451(a).

2. Now 8 U.S.C.A. § 1430(a).

3. Now 8 U.S.C.A. § 1427(a).

4. Now 8 U.S.C.A. § 1424(a).

335(a) Nationality Act of 1940, 54 Stats. 1157.[5]

### As To Illegality.

For the government to succeed in this primary charge, it must prove, first, that defendant, within ten years immediately preceding the day he filed his application for citizenship, was or had been a member of a party that advised, advocated or taught overthrow of this government by force or violence. The Communist Party of the U. S. is not mentioned in the law by name but defendant admits that he became a member of that organization in 1931, continued as such until 1938, when he resigned, after being instructed by its "higher ups" that it was better for attainment of the party's objectives that aliens become less voluble and less conspicuous.

■ It then only becomes necessary for plaintiff to prove that the Communist Party of the U. S. at the time defendant was a member, did advise, advocate or teach overthrow of this government by force or violence. It is not necessary to prove that defendant had knowledge of the objectives of the Communist Party of the U. S. If he was a member of that party, within the statutory ten year period, which he admits, and it develops that such organization was then advising, advocating or teaching forcible or violent overthrow of this government, he was not then eligible for citizenship, the prohibition being jurisdictional.

■ To prove this, plaintiff introduced much evidence that was "clear, unequivocal and convincing" Schneiderman v. U. S., 320 U.S. 118, 125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796; Knauer v. U. S., 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500.

William Nowell, member of the Communist Party of the U. S. from 1929–1936, testified in part:

(a) That in the years 1931 and 1932, as a representative of the Communist Party of the U. S. he attended the Lenin Institute at Moscow, operated by the Communist International and Russian Communist Parties, which taught that the Communist Party of the U. S. was a division of Communist International, and that both organizations advised, advocated and taught overthrow of our government by force or violence;

(b) That he, Nowell, during the 1930's, was District Director of Education for the Communist Party of the U. S. and as such was supervisor of the Workers' School in Detroit, where he taught that one of the aims and objectives of the Communist Party of the U. S. was violent overthrow of the United States Government;

(c) That he, Nowell, during the 1930's, was Director of the Communist Party of the U.S. book store, where he supervised distribution of Communist literature including certain textbooks of the Workers' School, published, distributed and circulated by the Communist Party of the U. S., which literature, advised, advocated and taught overthrow of this government by force and violence as one of the objectives of that party; and

(d) That these books prove beyond question that the violent overthrow of this government was advised, advocated and taught by Communist International and Communist Party of the U.S. between the years 1931 and 1938.

Paul Crouch, member of the Communist Party of the U.S. from 1925–1942, who has made a thorough study of the aims and objectives of the Communist Party of the U.S. and at various times has held prominent positions in the Communist Party of the U.S. also testified in part:

(a) That during the 1930's, he, Crouch, delivered lectures at official Communist schools in America in which he taught the aims of the Communist Party of the U. S., including violent overthrow of the government of the United States, and the tactics for carrying out said objectives; and

5. Now 8 U.S.C.A. § 1448.

(b) That during the same period, he, Crouch, contributed material to certain books published, distributed and circulated by the Communist Party of the U.S. and wrote many articles for the Daily Worker, which literature, advised, advocated and taught violent and forcible overthrow of this government.

In addition to that testimony, the government introduced books, periodicals, magazine articles, etc., available literature of the Communist Party of the U.S. for distribution between the years 1931 and 1938. A few extracts will suffice:

"The replacement of one social system by another, that is the replacing of the rule of one class by the rule of another, is only achieved by means of the violent overthrow of the ruling class, by means of *revolution*. It is impossible for the working class to come to power in any other way than by the method of revolutionary overthrow of the rule of the bourgeoisie, *by the method of proletarian revolution.*" (The Ultimate Aim, p. 8).

"But the overthrow of capitalism is impossible without force, without armed uprising and proletarian wars against the bourgeoisie." (The Struggle Against Imperialist War and the Tasks of the Communists, p. 10).

"As the leader and organizer of the proletariat, The Communist Party of the U.S.A. leads the working class in the fight for the revolutionary overthrow of capitalism, for the establishment of the dictatorship of the proletariat, for the establishment of a Socialist Soviet Republic in the United States * * *." (The Communist Party —A Manual on Organization by J. Peters, p. 8).

"Can such a radical transformation of the old bourgeois system of society be achieved without a violent revolution, without the dictatorship of the proletariat? Obvious-ly not." Joseph Stalin's Problems of Leninism, pp. 19–20).

"The dictatorship of the proletariat is the rule—unrestricted by law and based on force * * *." (Joseph Stalin's Foundations of Leninism, p. 53).

"The Communists disdain to conceal their views and aims. They openly declare that their ends can be attained only by the forcible overthrow of all existing social conditions." (The Communist Manifesto, p. 44).

"It follows that revolution requires, firstly, that a majority of the workers (or at least a majority of the class-conscious, thinking and politically active workers) should fully understand that revolution is necessary and be ready to sacrifice their lives for it." (Lenin's Left Wing Communism, p. 66).

"Armed workers and soldiers and marines seize the principal governmental offices, invade the residences of the President and his Cabinet members, arrest them, declare the old regime abolished, establish their own power, the power of the workers and farmers." (Why Communism by M. J. Olgin, p. 76).

"The necessity of systematically fostering among the masses *this* and just this point of view about violent revolution lies at the root of the *whole* of Marx's and Engel's teaching." (State and Revolution by V. I. Lenin, p. 20).

After the above evidence was introduced, defendant made no denial but contents himself now, through counsel, with questioning the reliability of testimony given by men who were formerly Communists. Our answer to that is, "Where better can the government go but to those who have previously participated in the disloyalty?" Reference is also made in defendant's brief to an attack on the Republican Party back in the 1850's—in which dire things were

prophesied as a result of its genesis. But these newspapers were giving their own prognostications of what would happen—not the credo of the Republican Party.

Defendant's counsel also seeks to impress the court with the fact that we should look to the entire context of any of the literature introduced—not extracts. That is true, but it is also significant to this court that out of all the above extracts only one is claimed to be in the least at variance with the context.

### Res Judicata.

██ The issue of res judicata has been raised as a bar to any further examination to determine the political affiliations of defendant or his adherence to the Communist Party of the U.S. at the time of his petition. This defense may be available in some denaturalization cases, but not here. Its application is confined to instances where both parties have had their day in court. As it was said in Johannessen v. United States, 225 U.S. 227, 238, 32 S.Ct. 613, 615, 56 L.Ed. 1066:

"Sound reason, as we think, constrains us to deny to a certificate of naturalization, procured ex parte in the ordinary way, any conclusive effect as against the public."

Also, our Supreme Court has often held:

"No alien has the slightest right to naturalization unless all statutory requirements are complied with; and every certificate of citizenship must be treated as granted upon condition that the government may challenge it, as provided in § 15 and demand its cancelation unless issued in accordance with such requirements. *If procured when prescribed qualifications have no existence in fact, it is illegally procured; * * *.*" U. S. v. Ginsberg, 243 U.S. 472, 475, 37 S.Ct. 422, 425, 61 L.Ed. 853. (Emphasis ours.)

"In exercising its power, Congress has authorized the courts to grant American citizenship only if the alien has satisfied the conditions imposed by Congress for naturalization. * * * *And so 'if a certificate is procured when the prescribed qualifications have no existence in fact, it may be canceled by suit.'* Tutun v. U. S., 270 U.S. 568, 578, 46 S. Ct. 425, 427, 70 L.Ed. 738." Baumgartner v. U. S., 322 U.S. 665, 672, 64 S.Ct. 1240, 1244, 88 L.Ed. 1525. (Emphasis ours.)

"If an anarchist is naturalized, the United States may bring an action under § 15 to set aside the certificate on the grounds of illegality. Since Congress by § 7 of the Act forbids the naturalization of anarchists, the alien anarchist who obtains the certificate has procured it illegally *whatever the naturalization court might find.*" Schneiderman v. U. S., 320 U.S. 118, 163, 63 S.Ct. 1333, 1355, 87 L.Ed. 1796. (Emphasis ours.)

For these reason, therefore, plaintiff government must prevail on the jurisdictional question that defendant was not eligible to become a citizen either when he filed his naturalization petition or when he took the oath, because admittedly, within the ten year statutory period, he had been a member of the Communist Party of the U. S., an organization that advised, advocated or taught overthrow of this government by force or violence.

### As To Fraud.

██ Under the fraud section of the complaint, the government must not only prove that the Communist Party of the U.S. was an organization with objectives above noted (which we have already held it has and which finding is made a part of this conclusion), but it must also prove that defendant knew that the Communist Party of the U.S. was such an organization advocating overthrow of this government by force or violence. This we also believe it has, by evidence

that was "clear, unequivocal and convincing," part of which, added to what we stated under "As to Illegality", is as follows:

Among other witnesses, Leo Syrakis testified, in part:

(a) That he was recruited into the Communist Party of the U.S. by defendant and that defendant and he attended closed meetings of the Party together;

(b) That defendant in his talks advocated overthrow of this government by force or violence at closed meetings of the Communist Party of the U.S.;

(c) That defendant had often stated at closed meetings that the aims of the Communist Party of the U.S. could not be realized by "vote" alone;

(d) That defendant was director of agitation and propaganda of the unit of the Communist Party of the U.S. to which they both belonged;

(e) That defendant was general secretary of the Greek "Fraction" of the Communist Party of the U.S. and member of the "buro" of the Greek "Fraction"; and

(f) That defendant presided over the Communist Party of the U.S. meeting which held the trial to expel him, Syrakis, from the Party.

William Nowell testified also in part:

(a) That defendant attended lectures delivered by him in the 1930's where Nowell taught, advised and advocated overthrow of this government by force or violence as one of the aims and objectives of the Communist Party of the U.S.;

(b) That defendant attended closed meetings of the Communist Party of the U.S. with him, Nowell, in the 1930's among which were many functionary meetings;

(c) That defendant, in the 1930's received orders from and gave reports to him, Nowell, who was then a District Functionary of the Communist Party of the U.S.; and

(d) That defendant's position with the Greek "Fraction" in the 1930's was of great importance to the Communist Party of the U.S.

Defendant himself testified:

(a) That from 1931 to 1938, he was a member of and attended closed meetings of the Communist Party of the U.S.;

(b) That in 1938, the General Secretary of the Party directed that all aliens cease their membership in the Party, whereupon defendant withdrew;

(c) That after his withdrawal and up to and including the day of his naturalization, he believed in the aims and objectives of the Communist Party of the U.S. which he said did not advocate overthrow of this government by force or violence.

(d) That he circulated and distributed the Daily Worker along with other Communist literature;

(e) That in 1934 and 1935, he was General Secretary of the Greek "Fraction" of the Communist Party of the U.S. in Detroit and as such made reports to the National Committee in New York City; and

(f) That he knew Syrakis and Nowell.

Plaintiff has also proven by competent testimony that defendant held other offices of trust and responsibility in the Communist Party of the U.S. during the years 1931 through 1938; and as a member of a "Unit" and a "Fraction", made speeches which advocated overthrow of this government by force or violence; went to national conventions and was most active in all its affairs, particularly in the distribution of Communist literature. All of which adds up to a discharge of the burden of proof resting on plaintiff and we find, therefore, that defendant was guilty of fraud in securing his American citizenship.

### The Fifth Amendment.

May we add this further thought: That while defendant apparently objects to cancellation of his American citizenship, we doubt very much that he will consider its loss a major catastrophe.

Early in the hearing, defendant admitted that he had been a member of

the Communist Party of the U.S. and that he severed his affiliation not because he disbelieved its ideologies nor had learned that it was planning overthrow of this government by force or violence. What he really did was to go through the motions of resigning only because his commanding officers ordered him to do so.

Then, when he was asked "Are you a Communist" which meant "are you a Communist today" he refused to answer and sought refuge in the much-abused Fifth Amendment to the Constitution of the United States by declaring that he feared his answer "might tend to incriminate him."

And to this hour not one word has been uttered by him against Communism or the Communist Party of the U.S. or any other Communist Party, so any illusion that he might have been "confused" when he made out his petition for naturalization completely vanishes.

■ There are those in this country who undoubtedly believe that the Fifth Amendment should justifiably be utilized whenever the occasion presents. This court does not impugn their sincerity. We only question the rationale of their conclusions. For the ordinary crimes prohibited by our Constitution or Acts of Congress—yes. But we are not fully convinced it was the intention of the founding fathers that the Fifth Amendment should be available where one's loyalty to that Constitution becomes suspect by refusal to answer a question of this nature. As stated in Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 646, 40 L.Ed. 819, the amendment should not be construed "to protect witnesses against every possible detriment which might happen to them from their testimony, nor to unduly impede, hinder, or obstruct the administration of criminal justice." So while this court permitted defendant the cloak provided by the Fifth Amendment, we did so with many misgivings. The shield may easily become a sword.

Incidentally, how could defendant know that his admission of membership in the Communist Party today—if such is a fact—could even "tend" to incriminate him unless he also knew what it advised, advocated and taught? The word "tend" might present a loophole for answer, but in this particular case the loophole is a small one.

It must be remembered that the very oath which this defendant took at the time he became an American citizen required that he would "support and defend the constitution and laws of the United States against all enemies, foreign and domestic." Still he insisted at this trial upon exemption from testifying as to whether or not he is a Communist, even in the light of what we know about that party today. Thus, in effect, he said, "I will not tell whether I am a Communist or belong to the Communist Party, because it might be that that organization wants to destroy our government by force or violence." In other words, "I will not wholeheartedly 'support and defend the constitution and laws of the United States against all enemies, foreign and domestic.'" Yet this man was a member of the Communist Party of the U.S. at one time. And we believe he knew then, knows now, and approves what the Communist movement intends to accomplish in this country. Is it not fair to conclude that he took the oath with reservations, a mental attitude condemned by our Supreme Court in Orth v. U. S., 4 Cir., 142 F.2d 969–970?

New conditions alter cases. The situation in the world is not normal. Security at home today demands trust in each other. As in times gone by, Cicero gave emphasis to pride of country by shouting "I am a Roman", it is our opinion that all true Americans should be even more anxious to cry out, "I am an American," at every opportunity, and if denying membership in a certain organization is deemed the slightest aid to promoting our security, denunciation of membership therein should be con-

sidered a supreme privilege if not a duty, particularly when you have taken the oath which our Supreme Court has said "relates to a state of mind and is a *promise of future conduct.*" (Emphasis ours.) Knauer v. U. S., 328 U.S. 654, 66 S.Ct. 1304, 1313, 90 L.Ed. 1500.

In the case at bar, it is a paradox that this defendant seeks protection of the flag in an American court but evidently only long enough so that the party or philosophy in which he will not deny membership can destroy that Constitution and trample upon that flag, robbing everybody else of the very liberties and freedoms of which he now takes advantage. His current refusal to testify is in our opinion more evidence of his fraud at the time he took the oath.

### Conclusion.

We hesitate to deprive any one of his American citizenship and, incidentally, this is the first case, we have been informed, at least in this circuit, where defendant in a Nationality proceeding first testified that he had been a member of the Communist Party of the U.S. during the statutory period and then refused to answer the question "Are you a Communist or a member of the Communist Party today?" But it must be borne in mind that this is not a criminal case. It is not an action under the so-called Smith Act. While membership in the Communist Party is probably some evidence of guilt, no court to our knowledge has pointedly and definitely said that such membership is in itself a crime. Further, and we repeat, the fact that defendant failed to answer the question whether he is now a Communist is not a reason why this court now revokes that citizenship. We find in favor of the government's position regardless of the Fifth Amendment, since we decided the legality of defendant's refusal to testify, in his favor.

It is also interesting to note that Polites' counsel writes, "The candor of the defendant deserves consideration of this court in evaluating the testimony." With this we agree. But, as stated in Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547, *evasiveness* (as well as candor) of the witness might be taken into consideration as to whether or not he knows what the Communist movement stood for then, stands for today, and his participation therein.

Defendant unquestionably was far from candid. On the contrary, he was evasive.

We believe that the wonderful gift of being an American citizen is so valuable that avenues for proclaiming faith and allegiance to our great country should be sought with zeal—not the dark alleys of evasion by the exercise of questionable, technical rights.

An order in compliance with this opinion will be presented for our signature.