**UNITED STATES of America**

**v.**

**Joseph William CHANDLER, also known as Joseph Shandalov, also known as Joseph Chandaloff, also known as Joseph Shandlor, also known as Rubin Halpert.**

**Civ. No. 7447.**

United States District Court
D. Maryland, Civil Division.

June 13, 1957.

170

Leon H. A. Pierson, U. S. Atty., and James H. Langrall, Asst. U. S. Atty., Baltimore, Md., Maurice A. Roberts, Atty., Crim.Div., Dept. of Justice, Washington, D. C., on the brief, for plaintiff.

Joseph Forer, Washington, D. C., and Harold Buchman, Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

This is an action under sec. 340(a) of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1451(a), to revoke defendant's naturalization on the ground that it was obtained by concealment of material facts and by material false representations made under oath in the proceedings which led to his naturalization. These concealments and misrepresentations dealt with his membership in the Communist Party, his prior arrests, his illegal departure from the United States to attend the Lenin School in Moscow, following his original legal entry in 1923, and his subsequent illegal entry into the United States.

In a reported opinion, D.C., 132 F. Supp. 650, Judge Coleman overruled a motion to dismiss the complaint. He held, however, that the government could not proceed under sec. 338(a) of the 1940 act, 8 U.S.C.A. (1940 Ed.) 738(a),

on the ground that the order and certificate of naturalization were illegally procured, but had to proceed under sec. 340(a) of the 1952 act, 8 U.S.C.A. (1953 Ed.) § 1451(a), on the ground that the order and certificate were procured by concealment of a material fact or by wilful misrepresentation. Pursuant to Judge Coleman's opinion, certain paragraphs were stricken from the complaint, and I denied a renewed motion to dismiss the amended complaint, D.C., 142 F. Supp. 557.

## The Statutes

The defendant was naturalized on May 14, 1943, while a member of the armed forces during World War II, under the provisions of section 701, which was added to the Nationality Act of 1940 by the Act of March 27, 1942, 56 Stat. 182, 187, 8 U.S.C.A. § 1440a.

The Nationality Act of 1940, 8 U.S.C.A. (1942 Ed.) 501 et seq.[1], was a comprehensive code governing the acquisition and loss of United States citizenship. Sub-chapter III—Nationality through Naturalization set forth the substantive and procedural requirements which aliens must meet to qualify for naturalization. 8 U.S.C.A. 701(d), stated: "A person may be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this Act, and not otherwise."

Among the requirements were five years continuous residence in the United States, and a showing of good moral character and attachment to the principles of the Constitution during that period, sec. 707, and lawful admission for permanent residence evidenced by a certificate of arrival, sec. 729. No person could be naturalized who, within a period of ten years preceding the filing of the petition for naturalization, had been a member of any organization that advocated the overthrow by force and violence of the government of the United States or distributed written or printed matter advocating such overthrow, or otherwise came within the ban of sec. 705. See note 2 below. Those requirements were mandatory; naturalization decrees obtained without strict adherence to the statutory conditions have frequently been set aside as illegal. United States v. Ginsberg, 243 U.S. 472, 37 S.Ct. 422, 61 L.Ed. 853; Maney v. United States, 278 U.S. 17, 49 S.Ct. 15, 73 L.Ed. 156.

1. All references herein to 8 U.S.C.A., unless otherwise noted, will be to the 1942 edition. [Now 8 U.S.C.A. § 1101 et seq.]

2. "§ 705. * * * No person shall hereafter be naturalized as a citizen of the United States—

"* * * (b) Who believes in, advises, advocates, or teaches, or who is a member of or affiliated with any organization, association, society, or group that believes in, advises, advocates, or teaches—(1) the overthrow by force or violence of the Government of the United States or of all forms of law; or * * * (c) Who writes, publishes, or causes to be written or published, or who knowingly circulates, distributes, prints, or displays, or knowingly causes to be circulated, distributed, printed, published, or displayed, or who knowingly has in his possession for the purpose of circulation, distribution, publication, or display any written or printed matter advising, advocating, or teaching opposition to all organized government, or advising, advocating, or teaching— (1) the overthrow by force or violence of the Government of the United States or of all forms of law; or * * * (d) Who is a member of or affiliated with any organization, association, society, or group that writes, circulates, distributes, prints, publishes, or displays, or causes to be written, circulated, distributed, printed, published, or displayed, or that has in its possession for the purpose of circulation, distribution, publication, issue, or display, any written or printed matter of the character described in subdivision (c). * * * The provisions of this section shall be applicable to any applicant for naturalization who at any time within a period of ten years immediately preceding the filing of the petition for naturalization is, or has been, found to be within any of the clauses enumerated in this section, notwithstanding that at the time petition is filed he may not be included in such classes. Oct. 14, 1940, c. 876, Title I, Subchap. III, § 305, 54 Stat. 1141."

Sec. 701, added in 1942, provided[3] that aliens serving honorably in the armed forces during World War II, "may be naturalized upon compliance with all the requirements of the naturalization laws", with stated exceptions from those requirements. Waived were the racial eligibility requirements, the age limitations, the restrictions on alien enemies, the declaration of intention, the five-year period of residence, educational requirements, and others. The requirement of lawful admission for permanent residence was modified, so that a lawful admission for a temporary period, as a seaman or student or tourist, would suffice. Among those *not* waived were the requirements of good moral character, attachment to Constitutional principles, and lawful admission and residence in the United States. The ban against aliens who at any time within the preceding ten years had belonged to an organization advocating the overthrow by force or violence of the government of the United States, or who otherwise came within sec. 705, was not eliminated.

■ Nor did sec. 701 waive the requirement of sec. 733, that the petition for naturalization be heard preliminarily by a designated naturalization examiner. The obvious purpose of such an examination is to afford the government an opportunity to investigate the fitness of the petitioner for naturalization, Corrado v. United States, 6 Cir., 227 F.2d 780, certiorari denied 351 U.S. 925, 76 S.Ct. 781, 100 L.Ed. 1455. Before granting naturalization, the United States is entitled to frank, honest and unequivocal

---

3. After defendant's naturalization, sec. 701 was amended by Acts of Dec. 22, 1944, 58 Stat. 886, and Dec. 28, 1945, 59 Stat. 658; so amended, it appears as 8 U.S.C.A. § 1001 in the 1951 cumulative annual pocket part. Since the section as amended in 1944 and 1945 is materially different from the statute as it stood in 1943, the statute in effect at the time of defendant's naturalization is set out in full in this note: "Sec. 701. Notwithstanding the provisions of sections 303 and 326 of this Act, any person not a citizen, regardless of age, who has served or hereafter serves honorably in the military or naval forces of the United States during the present war and who, having been lawfully admitted to the United States, including its Territories and possessions, shall have been at the time of his enlistment or induction a resident thereof, may be naturalized upon compliance with all the requirements of the naturalization laws except that (1) no declaration of intention and no period of residence within the United States or any State shall be required; (2) the petition for naturalization may be filed in any court having naturalization jurisdiction regardless of the residence of the petitioner; (3) the petitioner shall not be required to speak the English language, sign his petition in his own handwriting, or meet any educational test; and (4) no fee shall be charged or collected for making, filing, or docketing the petition for naturalization, or for the final hearing thereon, or for the certification of naturalization, if issued: Provided, however, That (1) there shall be included in the petition the affidavits of at least two credible witnesses, citizens of the United States, stating that each such witness personally knows the petitioner to be a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States, (2) the service of the petitioner in the military or naval forces of the United States shall be proved by affidavits, forming part of the petition, of at least two citizens of the United States, members or former members during the present war of the military or naval forces of the noncommissioned or warrant officer grade or higher (who may be the witnesses described in clause (1) of this proviso), or by a duly authenticated copy of the record of the executive department having custody of the record of petitioner's service, showing that the petitioner is or was during the present war a member serving honorably in such armed forces, and (3) the petition shall be filed not later than one year after the termination of the effective period of those titles of the Second War Powers Act, 1942, for which the effective period is specified in the last title thereof. The petitioner may be naturalized immediately if prior to the filing of the petition the petitioner and the witnesses required by the foregoing proviso shall have appeared before and been examined by a representative of the Immigration and Naturalization Service."

information from the applicant for citizenship in answer to questions which may throw light upon his qualification or disqualification for that privilege. United States v. Genovese, D.C.N.J., 133 F.Supp. 820, affirmed United States v. Montalbano, 3 Cir., 236 F.2d 757, certiorari denied 352 U.S. 952, 77 S.Ct. 327, 1 L.Ed.2d 244.

### Findings of Fact

In 1930 defendant filed a petition for citizenship, under the name of Joseph Shandler, in the Southern District of New York, but did not go through with it. In January, 1942, he was inducted into the armed forces of the United States. In March, 1942, he filed an application for a Certificate of Arrival and Preliminary Form for Petition for Naturalization, using the name Joseph Chandler, and stating that he had entered the country in December, 1922, under the name of Joseph Shandalov. In March, 1943, while stationed at Fort Screven, Georgia, he filed his Preliminary Form for Petition for Naturalization. On May 13, 1943, he appeared before Calhoun Fountain, a designated naturalization examiner, who conducted an oral examination. Following this oral examination, defendant filed a petition for naturalization in the United States District Court for the Southern District of Georgia, at Savannah, was admitted to citizenship on May 14, 1943, and took the prescribed oath.

The preliminary petition, which was before Fountain when he conducted his examination of defendant, stated: "8. My lawful admission to the United States, its territories, or its possesions, was at New York City, New York, under the name of Joseph Chandaloff on January 1, 1923, on the S. S. Adriatic. * * * 10. I am not, and have not been for the period of at least 10 years immediately preceding the date of this application, an anarchist; nor a believer in the unlawful damage, injury, or destruction of property, or sabotage; nor a disbeliever in or opposed to organized government; nor a member of or af-filiated with any organization or body of persons teaching disbelief in or opposition to organized government. I am attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States. It is my intention in good faith to become a citizen of the United States, and to reside permanently therein." The same statements were made in the final petition for naturalization.

Fountain asked defendant a number of questions, the same questions he asked other petitioners under similar circumstances. He indicated the questions he had asked by notes on the reverse side of the preliminary application. Fountain's testimony in open court under severe cross-examination convinced me that he did not remember any individual case but that he did remember quite clearly the form of the questions which he asked the petitioners. These included: (1) "Have you ever been out of the United States at any time since your arrival in the United States as specified in this form?" (2) "Have you ever been arrested at any time, anywhere, or do you have any prison record or any criminal record?" (3) "Are you now or have you ever been a communist, a nazi, a fascist, or a radical of any type?" Fountain's notes show that defendant answered "no" to these questions. It is possible that Fountain asked defendant whether he was then or had ever been a member of the Communist Party rather than whether he was then or ever had been a communist, but I find it is probable that he asked him whether he had ever been a communist. If Fountain had been told that defendant had ever been out of the United States since his original arrival, he would have referred the matter to the proper office of the Immigration and Naturalization Service for further investigation. If either of the other questions had been answered "yes", Fountain would have asked for additional information, would have made further investigation if he deemed it necessary, and would have brought the

matter to the attention of the judge, with appropriate recommendations. His recommendations would have depended upon the information he obtained.

Defendant entered the United States from Russia on January 1, 1923, having been born in Russia in 1906. On February 14, 1930, he was arrested in Philadelphia, Pennsylvania, charged with inciting to riot and disorderly conduct, but was discharged. Sometime in 1930, he came to the Pittsburgh area as district organizer of the Young Communist League. On September 1, 1930, he was arrested at McKeesport, Pennsylvania, and fined $50 for violation of a city ordinance (participating in an unauthorized meeting), disorderly conduct and resisting arrest. On June 1, 1931, at Youngstown, Ohio, he was arrested for inciting to riot; however, the case was dismissed for want of prosecution. In March, 1932, defendant and two others were indicted in Bell County, Kentucky, for unlawfully having in their possession literature advocating forcible resistance to constituted authority, criminal syndicalism and sedition, but the record does not show that defendant was ever arrested on that charge, and the indictment was dismissed for want of prosecution.

In November, 1932, defendant obtained a United States passport, giving his name as Rubin Halpert, and stating that he had been born in New York on October 12, 1910. The handwriting on the application and the passport photograph show clearly that it was defendant who obtained that passport. Using that passport, defendant, together with other communists who had been selected or approved by the Communist Party, left New York in November, 1932, and went to Moscow, where defendant attended the Lenin School. Defendant did not take the stand, but his counsel conceded that defendant had not legally entered or reentered the United States after November 12, 1932.

About 1934, defendant became section organizer for the New Kensington district of the Communist Party. He was an active member of the Party and attended closed meetings of the Party at least from 1930 to 1936, inclusive. There is evidence that he addressed one or more open communist meetings in 1937, but there is no evidence that he attended any other closed meetings until 1946, when he joined the District of Columbia Communist Party, and was assigned to the Laborers' Club, also known as the Frederick Douglass Club, to instruct them in communist doctrine. He attended several closed Communist Party meetings in 1946, but was not very active, and left the District of Columbia sometime during that year.

There is evidence that during World War II it was the policy of the Communist Party, in some areas at least, that when a member entered the armed forces he was technically dropped from party rolls during the time he was in the service. I do not find, therefore, that defendant was actually a member of the Communist Party at the time he was naturalized in 1943. I do find, however, that he had been an active member of the Communist Party during most if not all of the 1930s, and that he had penetrated sufficiently far into its councils to be thoroughly familiar with its ultimate objectives.

During the period from 1930 until 1936, while defendant was active in communist work in the Pittsburgh area, the Communist Party was distributing the following literature, which was offered in evidence: Karl Marx and Friedrich Engels, The Communist Manifesto; V. I. Lenin, State and Revolution; Program of the Communist International; The Struggle against Imperialist War and the Tasks of the Communists, Resolution of the Sixth World Congress of the Communist International; M. J. Olgin, Why Communism?; J. Peters, The Communist Party, a Manual on Organization; Alex Bittelman, The Communist Party in Action; Joseph Stalin, Foundations of Leninism. From this literature and other evidence in the case, I find as a fact that it was the ultimate objective of the Communist

Party of the United States to overthrow, by force and violence if necessary, the government of the United States, and that the leaders of the Party taught the doctrine that it would be necessary to use force and violence to accomplish that objective.

Even if there were no such evidence, I should take judicial notice of the fact that this was the ultimate objective of the Communist Party of the United States. To do otherwise, a judge would have to close his eyes not only to the communist classics, but also to books and articles published by William Z. Foster and other communist leaders during the early 1930s,[4] to statements made by Foster and other leaders of the Party before congressional committees and elsewhere prior to 1936, openly avowing the objectives of the Party, to the mass of evidence, much of it documentary, accumulated by various congressional committees over the years[5], which resulted, inter alia, in the findings in sec. 2(1) and (6) of the Internal Security Act, 50 U.S.C.A. § 781(1) and (6). Majority and minority opinions of the Supreme Court over the years have taken judicial notice of these and similar items.

It is true that during the period in question the Communist Party was a legal political party, authorized to be on the ballot in many states. On the other hand, the acknowledged leaders of the Party made no secret at that time of its ultimate objectives. It was not until later that the Party put on a false face and hid its true objectives.

Although the Communist Party in the United States has changed the party line, i.e. its public attitude and its professed objectives, from time to time, and has adopted various temporary objectives, such as full employment and racial equality, designed to appeal to various groups, it has not abandoned its ultimate objectives, which include the overthrow of the government of the United States by force and violence if necessary, and the substitution therefor of a communist form of government.

The testimony offered by the government in this case confirms our common knowledge that all members of the Party did not penetrate sufficiently into its councils to be chargeable with disloyalty to the United States. Many persons joined the Party because of the temporary and limited objectives which were featured in its public appeals. See Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796. The ultimate objectives were not stressed at open meetings, and many Party members had never heard of them or did not take them seriously. Defendant, however, made no effort to bring himself within either of those classes, by his own testimony or by producing other witnesses.

The testimony of defendant's associates in the Communist Party in the Pittsburgh area in the 1930s, whose testimony I accept as true, shows that from 1930 to 1936 defendant was committed to the ultimate objectives of the Communist Party. The testimony of Mrs. Markward, who was a member of the Com-

---

4. E. g. William Z. Foster, Toward Soviet America, Coward McCann, Inc., 1932, pp. 130, 213.

5. E. g. Report on the Strategy and Tactics of World Communism by Subcommittee No. 5 (Hon. Frances P. Bolton, Chairman) of the House Committee on Foreign Affairs, U. S. Government Printing Office 1948, and Supplement 1 thereto, entitled One Hundred Years of Communism, 1848–1948; Report on the Communist Party of the United States as an Advocate of Overthrow of Government by Force and Violence, House Committee on Un-American Activities, 80th

Cong., 2d Sess., U.S. Government Printing Office, 1948; The Communist Party of the U. S. as an Agent of a Foreign Power, House Report No. 209, 80th Cong., 1st Sess. 1947; testimony before House Committee to Investigate Communist Activities in the United States, 1931; see also Report of the Sub-committee of the Joint Legislative Committee to Investigate Procedures and Methods of Allocating State Moneys for Public School Purposes and Subversive Activities, Legislative Document, 1942, New York, popularly known as the Coudert Report.

munist Party as an informant for the Federal Bureau of Investigation, and whose testimony, unshaken by a rough cross-examination, I accept as true, convinces me that defendant was still committed to those ultimate objectives in 1946. I infer and find as a fact that he was committed to those ultimate objectives in 1943, when he took the oath of allegiance to the United States and swore that he was attached to the principles of the Constitution and well disposed to the good order and happiness of the United States.

Although mere membership in the Communist Party is not sufficient to show that such an oath could not have been taken in good faith, the activity of this defendant as an organizer of the Young Communists League, his attendance at the Moscow school, his activity as a section leader of the Communist Party, his subsequent assignment by the party as a teacher of communist doctrine, and other facts shown by the evidence, convince me that defendant did not take the oath of allegiance to the United States in good faith and without reservations, and that he was not attached to the principles of the Constitution.

This case was heard and the foregoing findings of fact were prepared before the decision of the Supreme Court in Jencks v. United States, 77 S.Ct. 1007. Since reading the opinions in that case, I have reviewed the motions made by defendant's counsel to examine statements given by some of the witnesses to the Immigration and Naturalization Service and the Federal Bureau of Investigation, and reports made by agents of those services of their conversations with those and other witnesses. Most of the statements and reports referred to persons other than the defendant; some of them dealt at length with his activities; some merely mentioned him among those present at certain meetings; and some were bare summaries of conversations with one of the witnesses. Various rulings were made. Many of the statements and reports were shown to defendant's coun-

sel, some with the name of the investigator eliminated. Some were not shown, after examination by the court revealed that they were essentially the same as other reports already shown to counsel. In some instances, what defendant's counsel wished to prove was that defendant's name was not included in a list, or that some activity on his part was not mentioned in a report. In those instances the facts were noted in the record, but defendant's counsel was not permitted to read the reports dealing with other persons. Defendant's counsel disclaimed any such desire in this case, and in most instances declared himself satisfied with the sufficiency of the information supplied.

At one point in the trial defendant's counsel asked for any report made by Mrs. Markward to the F.B.I. "referring to the practice about members of the Communist Party being in the armed services". No such report was produced, and no statement was made as to whether or not the government has such a report, either in writing from Mrs. Markward or in the form of a memorandum by someone else of a conversation with her. To the best of my recollection, defendant's counsel did not again refer to his original request for such report, and it was not mentioned in the argument. In view of the facts developed on the direct and cross examination of Mrs. Markward, and the testimony of John Lautner given in two proceedings before congressional committees, which was admitted in evidence at the request of defendant's counsel, I concluded that defendant might well have considered that he was not a member of the Party while he was in the armed forces. Defendant was, therefore, not prejudiced by the failure to produce the requested report, if in fact it exists.

Material so furnished by the government but not used by defendant's counsel in cross-examination has not been considered by me in making the foregoing findings, except where defendant requested that it be so considered because of a claimed inconsistency. Whether any of

it might have been offered in evidence by the government need not be decided in this case.

## Discussion

■ The false representations made by the defendant and the facts concealed by him were material. If defendant had truthfully answered the questions put to him by the examiner, he would have shown himself ineligible for naturalization. However, it is not necessary to rule in this case that he would certainly have been found ineligible; the test of materiality is not whether naturalization would have been refused if defendant had revealed the truth, but whether, by his false answers, the government was denied the opportunity of investigating the facts relating to his eligibility. Corrado v. United States, 6 Cir., 227 F.2d 780, certiorari denied 351 U.S. 925, 76 S. Ct. 781, 100 L.Ed. 1455; United States v. Genovese, 3 Cir., 236 F.2d 757, certiorari denied 352 U.S. 952, 77 S.Ct. 327, 1 L.Ed.2d 244; United States v. Lumantes, D.C.N.D.Cal., 139 F.Supp. 574, affirmed 9 Cir., 232 F.2d 216.

*A.* Defendant departed from the United States in 1932 in the guise of an American citizen named Rubin Halpert, with an American passport issued in that name; he attended the Lenin Institute in Moscow, and returned to the United States illegally, without a reentry permit, immigration visa, or other document required of an alien seeking admission. His residence in the United States thereafter was illegal.

■ Under the Nationality Act of 1940 and its predecessors, no alien could be naturalized who had not been lawfully admitted for permanent residence. Lawful admission as a non-immigrant for a temporary period would not suffice. Nor would admission for permanent residence suffice if entry was shown to have been unlawful; the lawful residence which the statute contemplated could not be predicated on an unlawful entry. See United States v. Lee Cheu Sing, 10 Cir., 189 F.2d 534; Werblow v. United States, 2 Cir., 134 F.2d 791; United States v.

Orrino, D.C.E.D.N.Y., 120 F.Supp. 569; United States v. Parisi, D.C.D.Md., 24 F.Supp. 414.

■ Sec. 701, as amended in 1942, created an exception in favor of aliens serving in the armed forces in World War II by requiring only that "having been lawfully admitted" he be a "resident" at the time of his enlistment or induction. See note 3, above. This was construed by the Immigration and Naturalization Service to permit the naturalization of aliens who had lawfully entered as non-immigrants for temporary periods, such as seamen, students and visitors, but who had overstayed. Most courts adopted this view. But no case has been cited or found which holds that a person whose last entry had been unlawful could qualify for citizenship under sec. 701 as it stood in 1943. Sec. 701 was amended in 1944 to eliminate in certain cases the requirement of lawful admission, but the 1944 amendment is not involved in this case. As it stood in 1943 no one could qualify for the benefits of sec. 701 unless he was a resident at the time of his enlistment or induction having been lawfully admitted. An alien who served in the armed forces after an unlawful entry was not a lawful resident at the time of his enlistment or induction, Petition of Wong Sie Lim, D.C.N.D.Cal., 71 F.Supp. 84, and was therefore not qualified for naturalization under sec. 701 as it stood in 1943. Lawful admission on a prior or subsequent occasion would not suffice.

Defendant cited four cases from the Southern District of New York which arose under P.L. 86, 83d Cong., 8 U.S. C.A. (1952 Ed.) 1440a. That act contained special naturalization provisions in favor of alien members of our armed forces during the Korean conflict, but, unlike sec. 701, did not require the alien to be a resident at the time of joining the armed forces; it merely required that he be physically present for a specified period. One of the cases cited by defendant was In re Boubaris, D.C.S.D. N.Y., 134 F.Supp. 613, where the alien's earlier lawful entry was held satisfactory

'for naturalization purposes under P.L. 86, notwithstanding a more recent illegal reentry. Since defendant's brief was filed, however, that case has been reversed by the Second Circuit. United States v. Boubaris, 2 Cir., 244 F.2d 98.

The issue in the instant case is whether the misrepresentation with respect to leaving the country was material. A truthful answer would have called for a further investigation to determine where defendant had gone and how he returned. Under the law as it stood in 1943, this would probably have led to a refusal of naturalization because of the illegal entry; it would probably also have led to the information with respect to the visit to Russia and defendant's Communist Party membership and activity. On both scores it was material.

*B.* If the examiner and the court had been told that during any part of the past ten years defendant had been a member of the Communist Party, and if the court had found that during defendant's membership, the Communist Party had advocated the overthrow of the government by force and violence or had distributed literature advocating such overthrow, defendant would have been statutorily ineligible for naturalization under 8 U.S.C.A. § 705. Sweet v. United States, 6 Cir., 211 F.2d 118, certiorari denied, 348 U.S. 817, 75 S.Ct. 28, 99 L.Ed. 644; United States v. Polites, D.C.E.D.Mich., 127 F.Supp. 768. If defendant had disclosed his membership when questioned about it by the naturalization examinor, the latter would have brought the matter to the attention of the court, and on the facts proved in this case, the court would probably have denied the petition. In re MacKay, D.C.N.D.Ind., 71 F.Supp. 397. The answers defendant gave to the question whether he was then or had ever been a communist prevented inquiry into a matter affecting his eligibility. It was clearly material.

▇▇▇ *C.* Although sec. 701 eliminated the usual five-year residence requirement, it did not also waive the statutory prerequisite of good moral character at the time of the application for naturalization. Under the Nationality Act of 1940 and kindred legislation, past misconduct could be taken into account in appraising present moral fitness. Marcantonio v. United States, 4 Cir., 185 F.2d 934; Ralich v. United States, 8 Cir., 185 F.2d 784; Molsen v. Young, 5 Cir., 182 F.2d 480; Yuen Jung v. Barber, 9 Cir., 184 F.2d 491; Petition of Ferro, D.C.M.D.Pa., 141 F. Supp. 404. Although defendant's arrests in 1930–1932 were not of themselves sufficient to show bad moral character in 1943, Schware v. Board of Bar Examiners, supra, and the single conviction might not of itself have resulted in a recommendation against naturalization, nevertheless, when taken together, they probably would have led to further investigation and discovery of defendant's Communist Party membership and activities. When considered in that light, the materiality of the question on the issue of good moral character increases.

### Conclusions

▇▇▇ The misrepresentations made to Fountain, the designated naturalization examiner, and the facts concealed from him, taken together, show clearly that defendant's naturalization was procured by means of material misrepresentations and concealment. The order admitting the defendant to citizenship must be revoked and set aside for that reason. The same result is required by my finding that defendant was not sincere in his written representation, under oath, that he was attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States.

I will enter a judgment revoking and setting aside the order admitting defendant to citizenship; cancelling his certificate of citizenship; directing defendant to surrender such certificate of naturalization to the Commissioner of Immigration and Naturalization; declaring that defendant is not and never was a duly naturalized citizen of the United

States and that he is not entitled to any of the rights and privileges of such citizenship; and forever restraining defendant from claiming any rights, privileges, benefits, or advantages under that order or certificate.