POLITES *v.* UNITED STATES.

No. 25.   Argued October 18, 1960.—Decided November 21, 1960.

*George W. Crockett, Jr.* argued the cause and filed a brief for petitioner.

*Charles Gordon* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Wilkey, Beatrice Rosenberg* and *Jerome M. Feit.*

MR. JUSTICE STEWART delivered the opinion of the Court.

Petitioner is a native of Greece who came to this country in 1916.   In 1942 he became a naturalized citizen by decree of the United States District Court at Detroit, under the provisions of the Nationality Act of 1940.[1]   In

---

[1] 54 Stat. 1137.

1952 the United States brought proceedings under § 338 (a) of the 1940 Act to revoke his citizenship.[2] These proceedings culminated in a judgment of denaturalization, 127 F. Supp. 768. An appeal from that judgment was docketed in the Court of Appeals for the Sixth Circuit. Subsequently, under circumstances to be related, counsel for the petitioner stipulated to dismissal of the appeal with prejudice, and the appeal was dismissed in accordance with the stipulation. Four years later the petitioner moved to vacate the judgment of denaturalization, relying upon Rule 60 (b), Fed. Rules Civ. Proc.[3] The District Court denied the motion, 24 F. R. D. 401, and the Court of Appeals affirmed, 272 F. 2d 709. Certiorari was granted to consider the availability of Rule 60 (b) relief in the circumstances here presented, 361 U. S. 958.

Section 305 of the Nationality Act of 1940 provided that no person should be eligible for naturalization who at any time within ten years preceding his application had been a member of any organization that advocated the overthrow by force or violence of the Government of the

---

[2] Section 338 (a) of the Nationality Act of 1940, 54 Stat. 1158–1159, provided: "It shall be the duty of the United States district attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings . . . for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground of fraud or on the ground that such order and certificate of naturalization were illegally procured."

[3] The provisions of Rule 60 (b) upon which the petitioner relied are as follows: "On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: . . . . (5) . . . it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment."

United States.[4] The Government's complaint in the 1952 denaturalization proceedings charged that the petitioner's citizenship had been illegally procured. because within ten years immediately preceding his application for naturalization he had been a member of the Communist Party of the United States, an organization which, it was alleged, advised, advocated, or taught the overthrow by force and violence of the Government of the United States.[5]

At the denaturalization hearing the petitioner, who was represented by counsel, testified that he had been a member of the Communist Party of the United States from "around" 1931 until 1938. He stated that he had attended closed Party meetings about once a month, that he had been secretary of the "Greek Fraction" of the Party in Detroit, and that he had left the Party in 1938 only because of a directive that all aliens resign from the Party at that time. Other witnesses described the petitioner as a "high functionary" of the Party, who at closed

---

[4] "No person shall hereafter be naturalized as a citizen of the United States—

. . . . .

"(b) Who believes in, advises, advocates, or teaches, or who is a member of or affiliated with any organization, association, society, or group that believes in, advises, advocates, or teaches—
    "(1) the overthrow by force or violence of the Government of the United States or of all forms of law; . . . .

. . . . .

"The provisions of this section shall be applicable to any applicant for naturalization who at any time within a period of ten years immediately preceding the filing of the petition for naturalization is, or has been, found to be within any of the clauses enumerated in this section, notwithstanding that at the time petition is filed he may not be included in such classes." 54 Stat. 1141.

[5] The complaint also alleged that the petitioner had obtained his naturalized citizenship fraudulently.

meetings had advocated the overthrow of existing government by force and violence.[6]

Based upon this and other testimony, the District Court found that the Government had proved by clear, unequivocal, and convincing evidence that the petitioner had been a member of the Communist Party of the United States within the statutory period, and that the Party was an

---

[6] The following are illustrative examples of such testimony:

"Q. What was his statement? What did he say?

"A. He say the way to organize, agitate—agitate the workers, organize them, in order to follow up when the time comes to overthrow the government by force and violence.

.     .     .     .     .

"Q. Did he ever say in your presence the methods that he was going to use?

"A. Well, the only method he said was by force. He said that we, the workers, would never be able to get in the Government by vote.

.     .     .     .     .

"Q. This was April and May, 1935. What did he say?

"A. We had this campaign for the bi-weekly paper, and he spoke very ardently to the members that we had to go ahead and subscribe and get the money that we supposed to collect in order to reach them workers and wait in our movement until the time comes when we would be able to overthrow the present government by force and violence.

"Q. And you heard him say that at a Greek Fraction meeting?

"A. Yes.

.     .     .     .

"Q. Do you know of your own knowledge what positions the defendant, Guss Polites, held in the Communist Party during that period of time?

"A. Not all of the positions. I do know that he was a member of the Fraction Bureau of the Greek Fraction, and my recollection is that he was Secretary of that Fraction for a time. At least, he was a high functionary and attended functionary meetings.

.     .     .     .

"A. He has, in speeches, advocated the overthrow of the government by force and violence, during my presence."

organization which "was then advising, advocating or teaching forcible or violent overthrow of this government." 127 F. Supp., at 770. Accordingly, the court held that the petitioner had illegally procured his citizenship, because he had not been eligible to become a citizen at the time his certificate of naturalization was issued.[7] A judgment cancelling the petitioner's citizenship was entered, 127 F. Supp. 768, 770–772.[8]

From this judgment the petitioner promptly appealed to the United States Court of Appeals for the Sixth Circuit. At the time there were pending in that court appeals from three other denaturalization judgments by the same District Court. *United States* v. *Sweet,* 106 F. Supp. 634; *United States* v. *Chomiak,* 108 F. Supp. 527; and *United States* v. *Charnowola,* 109 F. Supp. 810. Petitioner's counsel appeared and argued for the appellants in each of those three cases. Before the petitioner's brief was due, the Court of Appeals affirmed the judgments in all three of them, 211 F. 2d 118. The petitioner thereafter obtained an extension of time for filing briefs on the appeal of his case until thirty days after disposition by this Court of petitions for certiorari filed in the other three cases. When those petitions for certiorari were denied, 348 U. S. 817, the petitioner by his counsel

---

[7] In connection with the issue of fraudulent procurement, the court also found that the Government had proved by clear, unequivocal, and convincing evidence that the petitioner had personally known that the Communist Party of the United States was an organization advocating overthrow of this Government by force and violence. 127 F. Supp. 768, 772–773.

[8] The court also found that the petitioner had procured his citizenship fraudulently. The respondent now states that it does "not now rely upon the fraud finding as an alternative basis for the judgment of denaturalization." In the light of its concession that, "in view of the state of this particular record," the finding of fraud was not supported by sufficient evidence, we proceed upon that premise.

stipulated in the Court of Appeals that his appeal should be dismissed with prejudice, and the appeal was dismissed on November 10, 1954.

On August 6, 1958, the petitioner filed his motion under Rule 60 (b)(5) and (6) to set aside the 1953 denaturalization decree. The ground for the motion, supported by an affidavit of counsel, was that in the light of this Court's opinions in two cases which had recently been decided, *Nowak* v. *United States,* 356 U. S. 660, and *Maisenberg* v. *United States,* 356 U. S. 670, "it now appears that the . . . judgment of cancellation is voidable" and "that it is no longer equitable that said judgment should have prospective application." In denying the motion the District Court held that the *Nowak* and *Maisenberg* decisions "do not as contended by Polites clearly control the instant case warranting relief from judgment," and that, in any event, the doctrine of *Ackermann* v. *United States,* 340 U. S. 193, precludes reopening a judgment under Rule 60 (b) where the movant has voluntarily abandoned his appeal, and the only ground for the motion to reopen is an asserted later change in the judicial view of applicable law. 24 F. R. D. 401. The Court of Appeals affirmed "for the reasons set forth" by the District Court, 272 F. 2d 709.

It is the contention of the Government that the "instant case is squarely controlled by the decision of this Court in *Ackermann* v. *United States,* 340 U. S. 193, that a freely made decision not to appeal a denaturalization judgment may not be excused by permitting recourse to Rule 60 (b)(6) as a substitute for appeal." In that case Mr. and Mrs. Ackermann and a relative, Keilbar, had been denaturalized after a joint hearing. Keilbar appealed. The Ackermanns did not. On appeal the judgment of denaturalization against Keilbar was reversed upon a stipulation by the Government that the evidence was insufficient to support it. *Keilbar* v. *United States,* 144 F. 2d

866. The Ackermanns thereafter filed a motion under Rule 60 (b) to vacate the denaturalization judgments against them. They alleged that they had failed to appeal from the judgments because of financial inability and in reliance upon the advice of a government official whom they trusted, the official who was in charge of the detention camp in which they had been placed following their denaturalization. After reviewing these allegations the Court held that the District Court had been correct in denying the motion to reopen the judgments, holding that "[s]ubsection 6 of Rule 60 (b) has no application to the situation of petitioner." 340 U. S., at 202.

What the Court said in *Ackermann* is of obvious relevance here:

> "Petitioner made a considered choice not to appeal, apparently because he did not feel that an appeal would prove to be worth what he thought was a required sacrifice of his home. His choice was a risk, but calculated and deliberate and such as follows a free choice. Petitioner cannot be relieved of such a choice because hindsight seems to indicate to him that his decision not to appeal was probably wrong, considering the outcome of the *Keilbar* case. There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from." 340 U. S., at 198.

In the present case it is not claimed that the decision not to appeal was anything but "free, calculated, and deliberate." Indeed, there is not even an indication in this case, as there was in *Ackermann,* that the choice was influenced by reliance upon the advice of a government officer. The only claim is that upon the advice of the petitioner's own counsel the appeal was abandoned because there seemed at the time small likelihood of its

success, and that some four years later the applicable law was "clarified" in the petitioner's favor.

Despite the relevant and persuasive force of *Ackermann,* however, we need not go so far here as to decide that when an appeal has been abandoned or not taken because of a clearly applicable adverse rule of law, relief under Rule 60 (b) is inflexibly to be withheld when there has later been a clear and authoritative change in governing law. The fact of the matter is that that situation is not presented by this case. Without assaying by hindsight how hopeless the prospects of the petitioner's appeal may have appeared at the time it was abandoned,[9] it is clear that the later decisions of this Court upon which his motion to vacate relied did not in fact work the controlling change in the governing law which he asserted. The decisions in question are *Nowak* v. *United States,* 356 U. S. 660, and *Maisenberg* v. *United States,* 356 U. S. 670.

Petitioner contends that the *Nowak* and *Maisenberg* decisions reject the grounds relied upon by the District Court in revoking petitioner's citizenship in 1953. In the petitioner's denaturalization proceeding, the court held that a charge of illegal procurement of citizenship under the Nationality Act of 1940 could be sustained by clear, unequivocal and convincing evidence that (a) petitioner had been a member of the Communist Party within ten years immediately preceding the day he filed his citizen-

---

[9] It is worth pointing out, with respect to the three other denaturalization judgments whose affirmance by the Sixth Circuit assertedly led to the petitioner's decision not to pursue his appeal, that each was decided upon the facts of its own individual record. 211 F. 2d 118. And it need hardly be repeated at this late date that the refusal by this Court to review those cases imported "no expression of opinion on the merits." *Sunal* v. *Large,* 332 U. S. 174, 181; see *Maryland* v. *Baltimore Radio Show,* 338 U. S. 912.

ship application, and (b) the Communist Party had advised, advocated, or taught overthrow of the Government by force or violence during that period. Petitioner claims that this interpretation of the statute is erroneous because it fails to take into account the question of the petitioner's knowledge of the Party's activities. It was the claim of the petitioner's motion that *Nowak* and *Maisenberg* establish that "[a] charge of illegal procurement of citizenship based upon alleged membership in the Communist Party, cannot be sustained where the evidence fails to show . . . that the defendant was aware that the organization was engaged in the kind of illegal advocacy proscribed by law during the period of his membership therein." But the *Nowak* and *Maisenberg* decisions neither support nor oppose this intepretation of the 1940 Act. Those cases simply do not deal with the question.

In *Nowak* the petitioner had acquired his citizenship under the Nationality Act of 1906. That statute did not specifically prohibit citizenship to a member of an organization which advocated overthrow of the Government by force and violence. It did require an alien to have been "attached to the principles of the Constitution of the United States" for at least five years preceding his application for citizenship.[10] In order to show that Nowak had illegally procured his citizenship because during the five years preceding his naturalization he had not been "attached" to constitutional principles, the Government

---

[10] Paragraph Fourth of § 4 of the Act, 34 Stat. 596, 598, as amended, 8 U. S. C. (1934 ed.) § 382, provided that no alien should be admitted to citizenship unless immediately preceding his application he had resided continuously within the United States for at least five years and that during this period "he has behaved as a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States."

undertook to prove that he had been a member of the Communist Party with knowledge that the Party advocated the overthrow of the Government by force and violence. This Court found that the record contained adequate proof that Nowak had been a member of the Party during the pertinent five-year period, and it proceeded on the assumption that the evidence of the Party's illegal advocacy was sufficient. The Court held, however, that the Government had not established, under the standard required in denaturalization cases, that Nowak had known of the Party's advocacy of forcible governmental overthrow. Accordingly, the Court concluded that the Government had failed to prove Nowak's "state of mind," 356 U. S., at 666, his lack of "attachment" to constitutional principles, by the clear, unequivocal, and convincing evidence which is required. Cf. *Schneiderman* v. *United States,* 320 U. S. 118. *Maisenberg* was different in that the ultimate issue involved was whether the petitioner's citizenship had been obtained "by concealment of a material fact [and] willful misrepresentation." [11] 356 U. S., at 671. But there, too, the Court held that the Government had failed to prove the petitioner's state of mind, her lack of "attachment" to the constitutional principles required by the 1906 Act, by its proof of her Communist Party membership and of the Party's advocacy. [12]

In the present case, by contrast, the District Court held that determination of the issue of illegal procurement did

[11] The Government was seeking to denaturalize Maisenberg under the provisions of § 340 (a) of the Immigration and Nationality Act of 1952, 66 Stat. 260, 8 U. S. C. § 1451 (a). Under that statute illegal procurement as such is not a specific basis for cancellation of a certificate of naturalization.

[12] In view of this conclusion the Court did not reach the further question under the 1952 Act whether the Government had adequately proved that petitioner had misrepresented her attachment or concealed a lack of attachment. See 356 U. S., at 672, note 3.

not involve an inquiry into the petitioner's state of mind. Unlike Nowak and Maisenberg, the petitioner was naturalized under the Nationality Act of 1940, which withheld the right of citizenship to any alien who had been a member of a particular kind of organization during the statutory period.[13] The evidence that the petitioner was a "member of the Party" in every meaningful sense was abundantly shown. Cf. *Galvan* v. *Press*, 347 U. S. 522; *Rowoldt* v. *Perfetto*, 355 U. S. 115; *Niukkanen* v. *McAlexander*, 362 U. S. 390. The District Court found that the proof was also clear, unequivocal, and convincing that the organization to which the petitioner had belonged was in the category proscribed by the 1940 Act.[14] Those findings remain completely unaffected by anything that was decided or said in either *Nowak* or *Maisenberg*.

As the District Court viewed the issue of illegal procurement in this case, there was no occasion, as in *Nowak* and *Maisenberg*, to establish by inference or imputation the petitioner's personal beliefs, his "attachment" or lack of it. The court was concerned only with objective facts—the petitioner's membership and the Party's purpose. Upon the basis of its findings as to these factual issues, the Court held that the "government must prevail on the jurisdictional question that defendant was not eligible to become a citizen either when he filed his naturalization petition or when he took the oath . . . ." 127 F. Supp., at 772. As the issue was determined, therefore, the case was consistent with many decisions in which this Court has ruled that a certificate of citizenship is cancellable on the basis of illegal procurement if there has not

---

[13] See note 4, *supra*.

[14] It is to be emphasized that neither in his motion to set aside the denaturalization judgment nor in the supporting affidavit did the petitioner allege the existence of any new or mitigating evidence upon these factual issues. Cf. *Klapprott* v. *United States*, 335 U. S. 601.

been strict compliance with the conditions imposed by Congress as prerequisites to acquisition of citizenship. See *Maney* v. *United States,* 278 U. S. 17; *United States* v. *Ness,* 245 U. S. 319; *United States* v. *Ginsberg,* 243 U. S. 472; cf. *Schneiderman* v. *United States,* 320 U. S. 118, 163 (concurring opinion).

The validity of the District Court's interpretation of § 305 is not before us; we are not here directly reviewing the 1953 decision. We hold only that the decisions in *Maisenberg* and *Nowak* were not effective to alter the law controlling the petitioner's case.

*Affirmed.*

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACK, and MR. JUSTICE DOUGLAS join, dissenting.

In my view, the District Court should have exercised its discretion under Fed. Rules Civ. Proc., 60 (b) to determine whether it is any longer equitable that this judgment of denaturalization should have prospective application. The Court's opinion, although it refers to *Ackermann* v. *United States,* 340 U. S. 193, as "relevant and persuasive," expresses no definite view on the availability of Rule 60 (b) in this situation, but instead decides on the merits that the state of the law is substantially unchanged since the entry of the denaturalization decree. I would confirm the power of the District Court to act under Rule 60 (b), but remand the cause to that court so that it may, in the first instance, decide what effect the *Nowak* and *Maisenberg* decisions have on petitioner's case.

First, it is necessary to point out that *Ackermann* is not in point. For one thing, relief there was sought only under subdivisions (1) and (6) of Rule 60 (b), not, as here, under subdivision (5) as well. But more fundamentally, *Ackermann* was a case in which petitioners

could have secured a reversal of their denaturalization simply by appealing. Since they deliberately chose not to appeal, this Court held Rule 60 (b) unavailable. Here also petitioner chose not to appeal, but only because of the hopelessness of any chance of success. The Court of Appeals had affirmed judgments in three companion cases, and this Court had denied certiorari. True, denial of certiorari has no legal significance, and petitioner might have doggedly pursued his appellate remedies to the end. But as a practical matter such a course of action would have been futile. So petitioner's case must be considered not as one in which he could have appealed successfully, but as one in which he in fact did appeal unsuccessfully.

In that situation, it was the law long before the promulgation of Rule 60 (b) that a change in the law after the rendition of a decree was grounds for modification or dissolution of that decree insofar as it might affect future conduct. *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. 421, 431–432. This principle is rooted in the practice of courts of equity and is well settled in the vast majority of the States. See 7 Moore, Federal Practice (2d ed. 1955), ¶ 60.26 [4] ; *Ladner* v. *Siegel*, 298 Pa. 487, 148 A. 699. Perhaps before the merger of law and equity in 1938 a denaturalization proceeding was an "action at law." But a decree of denaturalization is a determination of status which has prospective effect, and there is no reason why in modern times it should not be governed by equitable principles.

The decisions under Rule 60 (b)(5) (adopted by the 1948 amendments to the Federal Rules of Civil Procedure) continue this history of equitable adjustment to changing conditions of fact and law. *McGrath* v. *Potash,* 199 F. 2d 166, a case decided under subdivision (6), but to which subdivision (5), by the respondent's admission, was equally applicable, is directly in point. There several aliens obtained a decree from a District Court enjoining

the Attorney General from proceeding to deport them without complying with the hearing requirements of the Administrative Procedure Act. Pending appeal by the Government, this Court held in *Wong Yang Sung* v. *McGrath,* 339 U. S. 33, that the Administrative Procedure Act did indeed apply to deportation proceedings. Seeing that further resistance would be futile, the Attorney General dismissed his own appeal by agreement. Shortly thereafter Congress overruled the *Wong Yang Sung* decision and expressly declared that proceedings relative to the exclusion or expulsion of aliens should not be subject to the Administrative Procedure Act. 64 Stat. 1048. The Government then moved under Rule 60 (b) for a dissolution of the injunction against it, relying on this change in law, and the motion was granted. The United States in this case seeks to distinguish that decision by asserting that here "the continuing force of the decree derives from facts fully accrued and litigated in the original judgment." True enough; but here, as in *McGrath,* although the facts were fully accrued at the time of the decree and have not changed, the law has (so petitioner asserts) radically changed, and in that situation it is unjust to give the judgment prospective effect.

The cases under Rule 60 (b)(5) relied on by the United States are readily distinguishable. In *Title* v. *United States,* 263 F. 2d 28, cert. denied, 359 U. S. 989, *Elgin Nat'l Watch Co.* v. *Barrett,* 213 F. 2d 776, and *Berryhill* v. *United States,* 199 F. 2d 217, it was entirely possible that the remedy by appeal would have been successfully invoked. And in *Collins* v. *City of Wichita,* 254 F. 2d 837, a modification of the judgment would have retroactively disturbed existing rights and financial reliance on the judgment. In *Scotten* v. *Littlefield,* 235 U. S. 407, relief was denied in a situation virtually identical to this case. But the point actually decided there was that a bill of review would not lie, and it is universally conceded that

Rule 60 (b) is not limited to those situations where the old confusing collateral remedies would have been available.

In sum, the District Court need "not abdicate its power to revoke or modify its mandate if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong." *United States* v. *Swift & Co.,* 286 U. S. 106, 114–115. It is revolting that petitioner should be subject to deportation because of a decree which he could not successfully have attacked on appeal and which subsequent events may have rendered erroneous. The principle of finality is not offended by modification which disturbs no accrued rights and concerns only future conduct.

Accordingly, I would reverse the judgment of the Court of Appeals and remand this case to the District Court with directions to exercise its discretion under Rule 60 (b)(5).