Norma J. NORGAARD and Delmar E. Norgaard, Plaintiffs–Appellants,

v.

DePUY ORTHOPAEDICS, INC., and Boehringer Mannheim Corporation, Defendants–Appellees.

No. 96–3892.

United States Court of Appeals, Seventh Circuit.

Argued May 12, 1997.

Decided July 31, 1997.

Roger Gomien, Joan N. Harrop (argued), Morris, IL, for Plaintiffs–Appellants.

Stanley C. Fickle (argued), Michael R. Conner, Barnes & Thornburg, Indianapolis, IN, John F. Martin, Dukes, Martin, Helm & Ryan, Danville, IL, for Defendants–Appellees.

Before POSNER, Chief Judge, and EASTERBROOK and EVANS, Circuit Judges.

EASTERBROOK, Circuit Judge.

In 1987 Norma Norgaard's physician fitted her with an artificial hip, including a socket

of a novel design sold as an "investigational device" under the Medical Device Amendments to the Food, Drug, and Cosmetic Act. See 21 U.S.C. § 360j(g). Seven years later her physician replaced the socket because its polyethylene liner had fractured. Norgaard and her husband then sued the manufacturer and designer of the prosthetic device under the common law of Illinois, contending that the liner's design was defective. Defendants removed the case to federal court under the diversity jurisdiction. The court entered summary judgment in their favor on the basis of *Slater v. Optical Radiation Corp.*, 961 F.2d 1330 (7th Cir.1992), which held that 21 U.S.C. § 360k(a)(1)—which negates application to an investigational medical device of any state "requirement" that is "different from, or in addition to, any requirement applicable under this chapter" unless the Secretary of Health and Human Services approves the state's additional requirement—preempts the application of state tort law to claims that devices approved by the FDA for investigation in clinical trials suffer from design defects. The purpose of the investigation, we observed, is to determine whether the device is suitable for general use, and awards of damages on a defective-design theory to persons who agree to participate in the trials cognizant of the risks would disrupt the progress of medicine. Federal law entitles the producers of investigational devices to hold users to their bargains; state tort law cannot undermine contracts protected by federal law.

The district court entered its judgment on April 18, 1996. Two months later, the Supreme Court held in *Medtronic, Inc. v. Lohr*, —— U.S. ——, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), that § 360k(a) does not preempt claims under state common law when the medical device in question has been cleared for market as "substantially equivalent" to a device already being sold. See 21 U.S.C. § 360e(b)(1)(B). *Medtronic* furnished the Norgaards with arguments they could have used to challenge the holding of *Slater*. But they had not filed a notice of appeal, or a motion in the district court under Fed. R.Civ.P. 59(e), to protect their rights in the event *Medtronic* should yield a favorable decision. Their lawyer was unaware that *Med-*

*tronic* was pending before the Supreme Court—unaware, too, of the conflict among the circuits, see —— U.S. at —— n. 6, 116 S.Ct. at 2250 n. 6, that led to the grant of certiorari. On July 12, 1996, sixteen days after the Court released *Medtronic*, and 85 days after the entry of judgment in the district court, the Norgaards filed a motion for relief from judgment under Fed.R.Civ.P. 60(b). They appeal from its denial. While their appeal was pending, our court held that *Medtronic* does not upset *Slater*. *Chambers v. Osteonics Corp.*, 109 F.3d 1243 (7th Cir. 1997). For reasons that will become apparent, we do not rely on this, lest the outcome imply that another Rule 60(b) motion would be in order should future developments call *Chambers* into question.

■ Losing parties have 30 days in which to appeal. Fed. R.App. P. 4(a)(1). This time may be extended to 60 on a showing of "good cause" (for motions filed before the expiration of the original 30 days) or "excusable neglect" (for motions filed later). If counsel had learned during this second 30 days that *Medtronic* was under advisement, and asked for permission to file a belated notice of appeal, the district court would have said no. Ignorance of the Supreme Court's docket, although "neglect," is not "excusable"—it is nothing but negligence, which does not justify untimely action. *United States v. Marbley*, 81 F.3d 51 (7th Cir.1996); *Prizevoits v. Indiana Bell Telephone Co.*, 76 F.3d 132 (7th Cir.1996). Cf. *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 395–97, 113 S.Ct. 1489, 1498–99, 123 L.Ed.2d 74, (1993). A prudent lawyer seeking to overcome a defense of preemption will find out how the statute is understood by other courts, a step that would have led counsel to the grant of certiorari in *Medtronic*. Doing this research only after judgment in the district court—indeed, after the time for appeal has expired—is inexcusable. (As it happens, the Norgaards' lawyer learned about *Medtronic* not as the result of research, but from a report of the decision in the *Chicago Daily Law Bulletin*.) The Norgaards accordingly have not sought relief under Rule 60(b)(1), which permits the reopening of judgments on account of "mistake,

inadvertence, surprise, or excusable neglect". Their motion rests entirely on Rule 60(b)(6), which covers "any *other* reason justifying relief from the operation of the judgment" (emphasis added).

■ The time limit in Rule 4(a)(1) would not be worth much if the losing side could revive the suit and proceed to the court of appeals by the expedient of filing a motion under Rule 60(b)(6). *Ackermann v. United States,* 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950), disapproved the use of Rule 60(b)(6) to have a second chance at an appeal. Ackermann and Keilbar lost in the district court. Keilbar appealed; Ackermann did not. After the court of appeals ruled in Keilbar's favor on grounds equally applicable to Ackermann, he filed a Rule 60(b) motion. To no avail, the Court held: "[Ackermann] made a considered choice not to appeal, apparently because he did not feel that an appeal would prove to be worth what he thought was a required sacrifice of his home [to underwrite the expense].... [Ackermann] cannot be relieved of such a choice because hindsight seems to indicate to him that his decision not to appeal was probably wrong, considering the outcome of the *Keilbar* case. There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from." 340 U.S. at 198, 71 S.Ct. at 212. If Rule 60(b) cannot be used to obtain a belated appeal from a judgment *known* to be wrong, given subsequent decisions of the court of appeals, it cannot be used to obtain a belated appeal from a judgment that might or might not be wrong, in light of subsequent decisions.

Today's case could have been decided in one line, with a citation to *Ackermann,* but for this passage in *Polites v. United States,* 364 U.S. 426, 433, 81 S.Ct. 202, 206–07, 5 L.Ed.2d 173 (1960):

> Despite the relevant and persuasive force of *Ackermann* ... we need not go so far here as to decide that when an appeal has been abandoned or not taken because of a clearly applicable adverse rule of law, relief under Rule 60(b) is inflexibly to be withheld when there has later been a clear and authoritative change in governing law.

By deciding *Polites* on the ground that a "clear and authoritative change in governing law" had not occurred after Polites abandoned his appeal, the Court invited the conclusion that if such a change occurs, then Rule 60(b)(6) might provide relief. Ever since, courts of appeals have wrestled with questions such as "how clear?", "how authoritative?", and "how long after the original decision?", with a strong current of unwillingness to reopen judgments but with some wriggle room for future arguments. For a sampling of these cases in this circuit alone, see *Parke–Chapley Construction Co. v. Cherrington,* 865 F.2d 907, 915 (7th Cir.1989); *In re Grand Jury,* 821 F.2d 1290, 1293 (7th Cir.1987); *McKnight v. United States Steel Corp.,* 726 F.2d 333, 336 (7th Cir.1984); *DeFilippis v. United States,* 567 F.2d 341, 343 n. 5 (7th Cir.1977). The Norgaards contend that they have a stronger claim than the many rejected in this sequence.

Although 37 years have passed since *Polites,* the Supreme Court has yet to hold that any exception to *Ackermann* is proper. If one is possible, the circumstances must be compelling, for reopening a judgment adds to the cost and postpones the completion of litigation. Judge Boudin astutely remarked that "there is good sense—as well as much precedent—to make this the rarest of possibilities. Decisions constantly are being made by judges which, if reassessed in light of *later* precedent, might have been made differently; but a final judgment normally ends the quarrel. Indeed, the common law could not safely develop if the latest evolution in doctrine became the standard for measuring previously resolved claims. The finality of judgments protects against this kind of retroactive lawmaking." *Biggins v. Hazen Paper Co.,* 111 F.3d 205, 212 (1st Cir.1997) (footnote omitted; emphasis in original).

*Polites* raised the possibility that "a clear and authoritative change in governing law" would justify reopening. That door was closed again in *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). After the Supreme Court adopted a new approach to the statute of limitations for securities suits, see *Lampf*

*Pleva Lipkind Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), many district courts dismissed cases as untimely—and the plaintiffs did not appeal, for under *Lampf* they had no chance of success. Congress then reinstated the pre-*Lampf* approach for all cases filed before that decision was announced—in other words, the legislation made *Lampf* non-retroactive. Cases dismissed between *Lampf* and the new statute were to be reinstated, so they could be decided under the approach used before *Lampf*'s announcement. 15 U.S.C. § 78aa–1(b). Here, surely, was the strongest possible case for reopening a judgment: a change of law that made an appeal seem futile, followed by a reinstatement of the former law and an express legislative declaration that the change was to govern cases closed in the interim. *Plaut* nonetheless held that the closed cases were not to be reopened, because diminishing rights the defendants possessed under the judgments rendered before the new legislation would violate the Constitution.

Now *Plaut* was based on the separation of powers; the Court concluded that Congress may not direct courts to disregard final judgments, because the "judicial Power" created in Article III is a power to render dispositive judgments. No such objection may be levied against a decision to reopen a judgment when Congress has not intervened. But would it not be odd to say that rights under judgments are *less* secure, the less the law has changed? *Plaut* dealt with a clear change of law, expressly made retroactive. Litigants such as the Norgaards can't point to anything so dramatic; the law is now what it was when they elected not to appeal, although a decision of the Supreme Court may have affected our understanding of the statute. The less startling the change, the weaker the losing party's interest in continuing the litigation. The legal system's interest in finality is correspondingly stronger—for new decisions of appellate courts consistently modify the legal landscape slightly and cast new light on old decisions. If new developments of this kind permitted revisiting of old judgments, finality would be impossible to achieve. Courts also would find it hard to handle new cases, if they could never deem the old ones closed. In *United States v. Keane*, 852 F.2d 199 (7th Cir.1988), we held that a reinterpretation of existing law did not justify reopening the monetary aspects of criminal judgments (that is, fines). Only ongoing custody or future collateral consequences support post-judgment relief, we held. Cf. *Barnickel v. United States*, 113 F.3d 704 (7th Cir.1997). Collateral review has always been allowed more freely in criminal than in civil cases. If financial aspects of criminal judgments do not change when understanding of the law changes, it is hard to see why financial aspects of civil judgments should change. Even when imprisonment is at issue, most changes of law do not affect judgments that became final before the change occurred. *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). It would be topsy-turvy, both historically and prudentially, to permit a change of law to upset a civil money judgment more readily than a criminal judgment, which affects liberty. Rule 60(b)(5) permits the revision of an ongoing decree, such as an injunction, when "a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application", which strongly implies that a money judgment (or a no-money judgment) is *not* to be upset just because the law on which it was founded has changed.

Litigants who want to take advantage of the possibility that the law may evolve—or who seek to precipitate legal change—must press their positions while they have the chance. If the law of the circuit is against a litigant (as *Slater* was against the Norgaards), the party still may appeal and ask the court to modify or overrule the adverse decision, or ask the Supreme Court to reverse the court of appeals. The Norgaards could have made the same arguments that the Lohrs made in *Medtronic*. The briefs in that case were readily available. Before filing suit on the Norgaards' behalf, their lawyer presumably planned some way to counter the defendants' inevitable invocation of § 360k(a)(1); they were welcome to try out these arguments in our court. Litigants who acknowledge that the circuit's law is adverse to them and candidly ask for revision based on new arguments, or who seek to preserve

**1078**

an older argument for a higher tribunal, well serve both their clients' interests and the administration of justice.

One court of appeals has held that a change of law by a state court in litigation involving the same events as the federal case may permit reopening. *Pierce v. Cook & Co.*, 518 F.2d 720 (10th Cir.1975) (en banc). No matter how persuasive a litigant's arguments, a federal court cannot alter or affect state law the way a state court may. A litigant whose adversary's choice of forum disables it from making a request for modification of state law—that is, a plaintiff whose case is removed to federal court, or a defendant haled into federal court initially—has a much better claim to use Rule 60(b)(6), if state law later changes in its favor, than do litigants such as the Norgaards. But even this claim is not strong enough, given *Plaut*. If Congress cannot tell a federal court to reopen a judgment in order to give the losing side the benefit of a change of law, neither may a state. Legitimate interests in finality also counsel against revision. Thus it can be no surprise that other circuits have not followed *Pierce*. See *Biggins* and *DeWeerth v. Baldinger*, 38 F.3d 1266 (2d Cir.1994). Cf. *McGeshick v. Choucair*, 72 F.3d 62 (7th Cir. 1995) (a change in state law does not justify recall of appellate mandate). Even after *Plaut* it remains conceivable that some kinds of legal change might permit resort to Rule 60(b)(6): a retroactive amendment to the Constitution is one possibility. Perhaps, too, a legal change coupled with an error that is not attributable to negligence—an error that a litigant was induced to make by the court itself, or an appeal pretermitted as a result of bad advice from the judge—might support relief. But the Norgaards' position is mundane. They could have appealed to a forum with authority to reexamine the meaning *Slater* gave to § 360j(g). Whether the decision to forego appeal was a tactical choice or a careless one, it ends the case. Cf. *United States v. 7108 West Grand Avenue*, 15 F.3d 632 (7th Cir.1994).

AFFIRMED.