**SHOSHONE–BANNOCK TRIBES OF THE FORT HALL RESERVATION, Plaintiff,**

v.

**Michael O. LEAVITT, Secretary of the United States Department of Health and Human Services, et al. Defendants.**

No. CV–96–459–ST.

United States District Court, D. Oregon.

Dec. 13, 2005.

Lloyd Benton Miller, Sonosky Chambers Sachse Miller & Munson PC, Anchorage, AK, Lori Irish Bauman, Ater Wynne Hewitt Dodson Skerritt, Portland, OR, for Plaintiff.

Sheila M. Lieber, Daniel Bensing, U.S. Department of Justice, Washington, DC, Kristine Olson, U.S. Attorneys Office, Portland, OR, for Defendants.

## OPINION AND ORDER

STEWART, United States Magistrate Judge.

### INTRODUCTION

Pursuant to FRCP 60(b)(6), plaintiffs, the Shoshone–Bannock Tribes of the Fort Hall Reservation ("Shoshone–Bannock Tribes" or "Tribes"), seek relief from the judgment rendered in this case in 2002, *Shoshone–Bannock Tribes of the Fort Hall Reservation v. Thompson,* Second Amended Final Order and Judgment, Civ. No. 94–459–ST (Aug. 6, 2002, docket # 179).

The Tribes argue that granting their motion will bring the judgment in this case into conformity with the United States Supreme Court's recent decision in *Cherokee Nation v. Leavitt,* 543 U.S. 631, 125 S.Ct. 1172, 161 L.Ed.2d 66 (2005) ("*Cherokee Nation*"), as well as with this court's original 1997 and 1998 opinions, all of which found the federal government's policy of not paying tribal contractors in 1996 and 1997 to be illegal and contrary to their rights to full payment of contract support costs under the Indian Self–Determination and Education Assistance Act, 25 USC §§ 450–450n ("ISDA"). The Tribes also argue that granting this relief will prevent them from being the only Tribal contractor, out of over 300 Tribal contractors within the United States, to be barred from receiving damages for the defendants' failure to pay full contract support costs due in those years.

For the reasons set forth below, the Shoshone–Bannock Tribes' Motion for Relief from Judgment (docket # 180) is granted.

### BACKGROUND

#### I. Procedural Posture

The ISDA encourages Indian tribes to enter into contracts to take over from the federal government the administration of various programs. 25 USC § 450f. In 1996, the Shoshone–Bannock Tribes were awarded a contract to administer various federal programs which, until then, had been administered by the Indian Health Service ("IHS"). Under the ISDA, tribes that contract to administer IHS programs must be paid their full "contract support costs" ("CSCs") to cover various contract expenses, and those funds by law must be added to the contract. *E.g.* 25 USC §§ 450j–1(a)(2), 450j–1(g).

In 1996 and 1997, the IHS failed to pay the funds required by the ISDA, contending that "the money for contract support costs was limited to a single pot too small to cover all the tribes that applied, [and] so it awarded it on a first come, first served basis." *See Shoshone–Bannock Tribes of the Fort Hall Reservation v. Thompson,* 279 F.3d 660, 664 (9th Cir.2002), *citing* Indian Self–Determination Memorandum 92–2 (Feb. 27, 1992).

In 1996, the Shoshone–Bannock Tribes filed this action against the Secretary of Health and Human Services ("HHS") and the Director of the IHS seeking damages for (among other things) the defendants' failure to pay CSCs (expressed by IHS as a "partial declination" to award the required CSC funding). *See Shoshone–Bannock Tribes of the Fort Hall Reservation v. Shalala,* 988 F.Supp. 1306, 1311–12 (D.Or.1997) ("*Shoshone–Bannock I*"). The Tribes' suit claimed both statutory and contractual rights to CSC funding.

Ruling on cross-motions for summary judgment, this court held in the first of two rulings as follows:

> [A]s a matter of law based on undisputed facts, this court concludes that defendants violated the ISDA by relying on the ISDM 92–2 to deny CSC funding to the Shoshone–Bannock Tribes in FY 1996 and are not entitled to summary judgment on the Ninth and Tenth Claims. However, it is not clear whether the Shoshone–Bannock Tribes are entitled to summary judgment in their favor to force payment of their requested CSC for FY 1996. The record contains no evidence as to whether or not sufficient appropriated funds are available to pay CSC to the Shoshone–Bannock Tribes. Again, it is the Secretary's burden to clearly demonstrate that IHS cannot possibly allocate any additional funds to pay CSC. And once again, given the inadequacy of the record on this issue, this court prefers the cautious approach of holding a hearing to permit the parties to fully develop the record.

*Id* at 1332–33.[1]

Based on a review of its language and legislative history, this court concluded that the ISDA's mandatory provisions had been added to overcome the Secretary's "bureaucratic recalcitrance," "system[atic] violat[ions]" of "self-determination contractors' rights," and "consistent failures over the [years] to administer self-determination contracts in conformity with the law," all as shown again by the record in this case. *Shoshone–Bannock I* at 1315–16 (quoting S Rep No 100–274, 100th Cong. 1st Sess. at 37 (1987) *reprinted in* 1988 USCCAN 2619).

The Shoshone–Bannock Tribes requested limited reconsideration of the denial of their summary judgment motion, arguing "that defendants already . . . had two opportunities to clearly demonstrate that funding was unavailable—once during the declination process and again in opposing summary judgment—and should not be allowed yet a third bite at the apple." *Shoshone–Bannock Tribes of the Fort Hall Reservation v. Shalala,* 999 F.Supp. 1395, 1396 (D.Or.1998) ("*Shoshone–Bannock II* "). In granting the Tribes' motion, this court agreed with the Tribes and held:

> By filing a cross-motion for summary judgment, defendants apparently viewed the record as sufficient to resolve the Ninth and Tenth Claims. Although defendants were no doubt surprised and disheartened that this court adopted a *de novo* standard of review, they offered no evidence on the sole factual issue presented by the Ninth and Tenth Claims, namely whether the Secretary had any unobligated and unrestricted funds available in FY 1996 with which to pay plaintiff's CSC claims without reducing any ongoing programs. Defendants never asserted that they had no such unrestricted funds available.

*Id* at 1397.

Reserving only the issues of the "appropriate amount of CSC, any monetary dam-

---

**1.** This court also rejected defendants' argument that, based upon a Congressional Committee Report, "$7.5 million was an appropriate sum to be allocated to new CSC for FY 1996," holding that "no statutory minimum or maximum was placed on CSC funding." *Id.* at 1331. This court instructed that instead "the Secretary should receive the CSC requests for each fiscal year and then try to allocate as much funding as possible from the lump sum appropriation for that year to pay those requests." *Id.* at 1332. The Supreme Court came to the same conclusion, noting that the Secretary's interpretation of the legislative history "shows only that the Executive Branch officials would have liked to exercise discretionary authority to allocate a lump-sum appropriation too small to pay for all the contracts that the Government had entered into," but that Congress had not "granted such authority." *Cherokee Nation,* 543 U.S. at 644, 125 S.Ct. at 1181.

ages, prejudgment interest and costs of suit, including attorney fees," this court entered judgment in favor of the Tribes on their CSC claims. *Id.* at 1398.

The Tribes and IHS subsequently reached agreement as to the precise amount of the Tribes' fiscal year 1996 and fiscal year 1997 CSC claims. *Shoshone–Bannock Tribes of the Fort Hall Reservation v. Shalala,* 58 F Supp 3d 1191, 1194 (D.Or.1999) (*"Shoshone–Bannock III"*). This court then entered an amended judgment requiring IHS to pay the Tribes $373,936.05 as damages for its fiscal years 1996 and 1997 CSC claims. Amended Final Order & Judgment, (Aug. 25, 1998, docket #111), p. 3. This judgment resolved all CSC issues then pending at the trial court level, and on October 9, 1998, IHS filed its notice of appeal with the Ninth Circuit.[2]

Less than two weeks later on October 21, 1998, Congress enacted the OMNIBUS CONSOLIDATED AND EMERGENCY SUPPLEMENTAL APPROPRIATIONS ACT OF 1999, Pub.L. No. 105–277, 112 Stat. 2681, which included the following as Section 314:

> Notwithstanding any other provision of law, amounts appropriated to or earmarked in committee reports for the Bureau of Indian Affairs and the Indian Health Service by Public Laws 103–138, 103–332, 104–124, 104–208 and 105–83 for payments to tribes and tribal organizations for contract support costs associated with self-determination or self-governance contracts, grants, compacts, or annual funding agreements with the Bureau of Indian Affairs or the Indian Health Service as funded by such Acts, are the total amount available for fiscal years 1994 through 1998 for such purposes, except that for the Bureau of Indian Affairs, tribes and tribal organizations may use their tribal priority allocations for unmet indirect costs of ongoing contracts, grants self-governance compacts or annual funding agreements.

*Id.* (quoted in *Shoshone–Bannock III,* at 1195).

After the passage of Section 314 and the remand of the case to the district court, IHS moved for reconsideration of the summary judgment rulings, contending Section 314 cut off the Tribes' right to full contract payments. However, this court held that Section 314 did not retroactively "deprive plaintiff of its vested rights or . . . 'nullify' this court's ruling," and rejected such interpretations as constitutionally suspect. *Shoshone–Bannock III,* at 1201.[3] Section 314 was narrowly construed as a limit only on the expenditure of unobligated funds remaining from 1996 and 1997. *Id.*[4]

On appeal—and contrary to the Supreme Court's eventual ruling in *Cherokee Nation*—the Ninth Circuit reversed, holding that the Tribes' contract with IHS "expressly precludes an independent claim" to funding for contract support costs:

> Because of the express language subjecting provision of [ISDA] funds to "availability of appropriations," and the clear statement that this limitation ap-

---

**2.** About 10 weeks later, IHS paid into the registry of this court a total of $511,114.05, including fiscal year 1998 CSC funds payable on account of the court's final judgment. Stipulation and Order (Nov. 9, 1998, docket #125).

**3.** *See also Cherokee Nation,* 543 U.S. at 646, 125 S.Ct. at 1182 ("The [IHS's] interpretation would undo a binding governmental contractual promise. A statute that retroactively repudiates the Government's contractual obligation may violate the Constitution.").

**4.** *See also Cherokee Nation,* 543 U.S. at 646, 125 S.Ct. at 1182 (concluding "Section 314's language may be read as simply forbidding the Service to use those left-over funds for [paying unpaid CSC].").

plies "notwithstanding any other provision in this Act," Congress plainly excluded the possibility of construing the contract support costs provision as an entitlement that exists independently of whether Congress appropriates money to cover it.

*Shoshone–Bannock Tribes of the Fort Hall Reservation v. Thompson,* 269 F.3d 948, 952 (9th Cir.2001) (internal footnotes omitted), *opinion amended and replaced by* 279 F.3d 660 (9th Cir.2002).

The Ninth Circuit then relied heavily on Section 314 to conclude that only $7.5 million, rather than the entire $1.7 billion appropriated to IHS in 1996, was legally available to pay CSCs. *Id.* at 952–54. Upon the Tribes' petition for rehearing, the Ninth Circuit amended its opinion in three places irrelevant to the matter at hand, but otherwise denied the petition. *See Shoshone–Bannock Tribes of Fort Hall Reservation v. Thompson,* 279 F.3d 660 (9th Cir.2002) (*"Shoshone–Bannock IV"*). The Tribes did not file a petition for *certiorari.*

On remand, this court dismissed the Tribes' CSC claims. Second Amended Final Order and Judgment (August 6, 2002, docket # 179), p. 3. It is the Second Amended Final Order and Judgment that the Shoshone–Bannock Tribes seek to reopen by this motion.[5]

## II. *Related Cases*

Hundreds of other Tribal contractors were experiencing problems similar to those the Shoshone–Bannock Tribes were experiencing with CSC shortfalls. Several other Tribal contractors filed lawsuits seeking damages for unpaid CSCs.

One such case was a suit by the Cherokee Nation and the Shoshone–Paiute Tribes of the Duck Valley Reservation, brought to recover damages for CSC underpayments during fiscal years 1996 and 1997, the same years at issue here. The United District Court for the Eastern District of Oklahoma denied the claims, and the Tenth Circuit affirmed, stating that it "agree[d] with the Ninth Circuit that a better reading of the language [of Section 314] is that Congress intended to limit the amount available for new or expanded CSCs to $7.5 million." *Cherokee Nation v. United States,* 190 F.Supp.2d 1248 (E.D.Okla.2001), *aff'd, Cherokee Nation v. Thompson,* 311 F.3d 1054, 1064–65 (10th Cir.2002).

The Cherokee Nation was simultaneously litigating another action against IHS before the Department of the Interior's Board of Contract Appeals ("the Board") seeking damages over CSC underpayments occurring in fiscal years 1994, 1995 and 1996. *In re Cherokee Nation of Okla.,* IBCA Nos. 3877–79, 99–2 BCA (CCH) ¶ 30,462, 1999 WL 440045 (1999), *recon. denied, In re Cherokee Nation of Okla.,* IBCA Nos. 3877–79, 01–1 BCA (CCH) ¶ 31,349, 2001 WL 283245 (2001). In that action the Board in June 1999 sustained the Tribe's claims and the Federal Circuit affirmed, expressly disagreeing with the approaches of the Ninth and Tenth Circuit cases. *Thompson v. Cherokee Nation,* 334 F.3d 1075, 1089 (Fed.Cir.2003).

---

**5.** Granting relief from the Second Amended Final Order and Judgment would reinstate the Amended Final Order and Judgment (Aug. 25, 1998, docket # 111), require IHS to pay to the Tribes the $511,114.05 previously paid into the court's registry (Stipulation and Order, Nov. 9, 1998, docket # 125), require IHS to pay the $175,638.70 in attorneys' fees and $30,517.06 for other litigation expenses (Opinion and Order, Oct. 16, 1998, docket # 120), and require IHS to pay to the Tribes $3,868.30 in taxable costs (Taxation of Costs, dated Oct 17, 1998, entered Oct. 19, 1998).

In 2004 the Supreme Court granted petitions for writs of *certiorari* in both cases to resolve the conflict between the Circuits. *Cherokee Nation*, 543 U.S. at 637, 125 S Ct at 1177.[6]

The Supreme Court concluded that the Government's "promises to pay certain 'contract support costs' that the Tribes incurred during fiscal years 1994 through 1997" were "legally binding," *id* at 1176, and rejected the Government's arguments that each Appropriations Act's $7.5 million Indian Self–Determination Fund limited the availability of appropriations to pay the contracts. *Id* at 1181. In interpreting Section 314 the Supreme Court recognized that the Government's interpretation "would undo a binding governmental contractual promise" and explained that "[a] statute that retroactively repudiates the Government's contractual obligation may violate the Constitution." *Id* at 1182. Finding the Government's arguments on Section 314 "inadequate," the Court adopted the precise interpretation this Court adopted in *Shoshone–Bannock III*.

## III. *Class Action*

After the decision in *Cherokee Nation,* the District Court for the District of New Mexico reactivated a four-year old putative class action filed by the Pueblo of Zuni in 2001 on behalf of all ISDA Tribal contractors who contracted with the IHS from 1993 to the present. *See Pueblo of Zuni v. United States, et al.,* Case No. CIV 01–

1046 BB/WPL, First Amended Complaint, at ¶ 53 (p. 25), filed Dec. 12, 2001 (Dkt. No. 5).[7] The Tribes note that class certification proceedings in *Zuni* are underway and expected to continue into 2006 given the current class discovery schedule. Except for the unfortunate timing of the Ninth Circuit's ruling in *Shoshone–Bannock IV,* the Tribes would today be a member of that putative class or otherwise able to recover damages for the CSCs IHS failed to pay.

## IV. *Effects of Unpaid CSCs*

The Shoshone–Bannock Tribes, like many Tribal contractors operating IHS programs and facilities, are severely underfunded. Congress found that "[t]he consistent failure of federal agencies to fully fund tribal indirect costs ... resulted in financial management problems for tribes as they struggle[d] to pay for federally mandated annual single-agency audits, liability insurance, financial management systems, personnel systems, property management and procurement systems and other administrative requirements." S Rep 100–274, p. 8. Congress also noted that the IHS "failed to request from the Congress the full amount of funds needed to fully fund indirect costs associated with self-determination contracts," but at the same time continued to impose administrative requirements on Tribal contractors "more stringent than the requirements

---

**6.** Although the claims of the Shoshone–Bannock Tribes arose from fiscal years identical to the two Cherokee Nation cases, *Shoshone–Bannock* was by mere happenstance the first of the three to reach a circuit court decision. Had the Federal Circuit in 2000 not rejected the Secretary's initial appeal on jurisdictional grounds, *Thompson v. Cherokee Nation,* 334 F.3d at 1083 n. 4, leading to two more years of litigation before that Circuit's ultimate ruling, the first intercircuit conflicts would have been between that Circuit's ruling and the Ninth Circuit's ruling here, with this case

then being the Supreme Court's vehicle for resolving that conflict. But as it turned out, the conflict between the Circuits on this issue did not become apparent until more than a year after the expiration of the 90–day period for petitioning the Supreme Court to review the Ninth Circuit's decision here. *See* Supreme Court Rule 13.

**7.** Although a copy of this pleading is not in this court's record, defendants have not disputed the pendency of this class action or the description of the putative class.

that are imposed on the Federal agencies themselves." *Id.* at 9.

Tribal contractors were left to raid Tribal trust fund revenues needed for economic development and other Tribal assistance programs, cut the level of already underfunded services to Tribal members, cut administrative expenses and risk violating federal requirements and prudent management standards, or abandon Tribal self-determination altogether. *Id* at 12–13. Thus, the failure of the IHS to pay the Shoshone–Bannock Tribes the CSCs it owed resulted in significant impacts upon the health services provided to Tribal members.

## DISCUSSION

At issue in this motion is whether this court should grant relief from its Second Amended Final Order and Judgment and reinstate its previous rulings ordering the IHS to pay to the Tribes approximately $500,000.00 in CSCs. Defendants contend that the judgment is final and that the Supreme Court's decision in *Cherokee Nation,* which squarely rejects the position taken by the Ninth Circuit in *Shoshone–Bannock IV* and which would mandate payment of the Tribes' CSCs if this lawsuit were filed today, does not assist the Tribes because it was issued after *Shoshone–Bannock IV,* a decision from which the Tribes did not file a petition for *certiorari.* This court disagrees.

## I. *Legal Standard*

 FRCP 60(b) provides that the court may relieve a party from a final judgment, order, or proceeding.[8] Motions brought under FRCP 60(b) require the court to balance the interest in finality of judgments (ones which should not lightly be disturbed), and the desire to achieve justice. *See Rodgers v. Watt,* 722 F.2d 456, 459 (9th Cir.1983) (FRCP 60(b) should be construed, along with the other Federal Rules of Civil Procedure, "to achieve the just determination in every action."). As a result, such motions are addressed to the sound discretion of the district court. *See Thompson v. Housing Auth. of the City of Los Angeles,* 782 F.2d 829, 832 (9th Cir.), *cert denied,* 479 U.S. 829, 107 S.Ct. 112, 93 L.Ed.2d 60 (1986); *Martella v. Marine Cooks & Stewards Union,* 448 F.2d 729, 730 (9th Cir.1971), *cert denied,* 405 U.S. 974, 92 S.Ct. 1191, 31 L.Ed.2d 248 (1972). Moreover, the Ninth Circuit has repeatedly recognized that because FRCP 60(b) is remedial in nature, it should be applied liberally. *See, e.g., In re Roxford Foods, Inc.,* 12 F.3d 875, 879 (9th Cir.1993); *Gregorian v. Izvestia,* 871 F.2d 1515, 1522 (9th Cir.), *cert denied,* 493 U.S. 891, 110 S.Ct. 237, 107 L.Ed.2d 188 (1989); *Meadows v. Dominican Republic,* 817 F.2d 517, 521 (9th Cir.), *cert denied,* 484 U.S. 976, 108 S.Ct. 486, 98 L.Ed.2d 485 (1987).

 The Tribes' motion is premised upon FRCP 60(b)(6), which permits a court to set aside a judgment for "any other reason justifying relief from the operation of the judgment." That clause untethers the discretion of judges from the constraints of common law remedies and grants broad remedial power to vacate judgments where justice so requires:

[FRCP] 60(b) strongly indicates that courts no longer are to be hemmed in by the uncertain boundaries of . . . common law remedial tools. In simple English, the language of the 'other reason' clause,

---

8. FRCP 60(b) provides, in pertinent part:
 On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following rea-
 sons: (1) mistake, inadvertence, surprise, or excusable neglect; . . . or (6) any other reason justifying relief from the operation of the judgment.

for all reasons except the five particularly specified [in FRCP 60(b)(1) through 60(b)(5)], vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice.

*Klapprott v. United States,* 335 U.S. 601, 614–15, 69 S.Ct. 384, 93 L.Ed. 266 (1949).

This court finds that the balance in this case tips decidedly in favor of achieving justice and necessitates unwinding the Second Amended Final Order and Judgment.

## II. *Analysis*

### A. *Trust Relationship Between the Parties*

■ Defendants seek to focus this court's attention on the narrow time frame between the entry of the Second Amended Final Order and Judgment and the decision in *Cherokee Nation.* However, one of the distinguishing factors in this case requires this court to turn its attention back in time to the issue addressed in *Shoshone–Bannock I* and ultimately to the nature of the relationship between the parties that existed prior to and during this litigation.

In this court's first attempt to address the issues in this case, it surveyed the judicial landscape and noted the pervasive presumption favoring Indian rights premised upon the unique trust relationship between the United States and its first citizens. *Shoshone–Bannock I,* 988 F.Supp. at 1317. Despite that relationship, defendants took the untenable (and now flatly rejected) position that it could promise to pay the CSCs, but then refuse to pay them unless Congress appropriated sufficient funds:

> The Government does not deny that it promised to pay the relevant contract support costs. Nor does it deny that it failed to pay. Its sole defense consists of the argument that it is legally bound by its promises if, and only if, Congress

appropriated sufficient funds, and that, in this instance, Congress failed to do so. The Government in effect concedes yet more. It does not deny that, *were these contracts ordinary procurement contracts,* its promises to pay would be legally binding.

> \* \* \* \* \* \*

> [I]f it is nonetheless to demonstrate that its promises were not legally binding, it must show something special about the promises here at issue. That is precisely what the Government here tries, but fails, to do.

*Cherokee Nation,* 543 U.S. at 638, 125 S.Ct. at 1177–78 (emphasis in original).

Defendants' two primary arguments against the present motion are hauntingly similar in tenor. Although recognizing that the Tribes would be entitled to recover their full CSCs were this case filed now, defendants argue that the Tribes are out of luck because final means final and because the Tribes failed to file a petition for *certiorari.* This court is not persuaded that the concerns cited by defendants justify the inflexible refusal to revisit the judgment entered by this court given the circumstances presented here.

### B. *Finality Concerns*

Defendants rely heavily on the notion that the Second Amended Final Order and Judgment should not be disturbed because it was final. However, other than to state that general rule, defendants identify no pressing finality concerns. Unlike other cases in which granting relief from a judgment might have a significant effect on other proceedings, *see, e.g., United States v. Washington,* 394 F.3d 1152 (9th Cir. 2005), *petition for cert. filed,* —— U.S ——, 126 S.Ct. 1025, —— L.Ed.2d ——, 2006 WL 37082 (2005) (concerns that reallocating fishing rights would "wreak havoc on hard-

wrought management agreements and plans"), this case involves nothing more than the issue of whether the federal government must abide by its promise to pay full CSCs of approximately $500,000.

The Tribes point out that they are one of many victims of a single wrong, namely the IHS's decision to refuse to pay the CSCs. It is apparently undisputed that unless this court grants relief from the judgment, the Shoshone–Bannock Tribes will stand alone as the only tribal contractor denied full CSCs. Unlike the cases relied on by defendants, this case involves a request for relief by a co-victim of the same wrongful act that was the subject of new decisional law.

### C. *Failure to File Petition for Certiorari*

In 1993, the Ninth Circuit noted that the Supreme Court has "suggested that 'when an appeal has been abandoned or not taken because of a clearly applicable adverse rule of law,' it might be wrong to inflexibly withhold relief under Rule 60(b) 'when there has been a clear and authoritative change in the governing law.'" *Clifton v. Attorney Gen. of State of Cal.*, 997 F.2d 660, 664 n. 5 (9th Cir.1993), quoting *Polites v. United States*, 364 U.S. 426, 433, 81 S.Ct. 202, 5 L.Ed.2d 173 (1960). In this case, in the face of no other authority conflicting with the decision against them by the Ninth Circuit, the Shoshone–Bannock Tribes opted to not file a petition for *certiorari* with the Supreme Court. The Supreme Court's decision in *Cherokee Nation* is certainly a clear and authoritative change in the governing law.

*Shoshone–Bannock IV* was the first circuit court decision to weigh in on the issue of the Government's ability to sidestep payment of CSCs, decisively ruling in the Government's favor. Nine months later, the Tenth Circuit reached the same conclusion, affirming a decision from the Eastern District of Oklahoma denying claims brought by the Cherokee Nation and the Shoshone–Paiute Tribes of the Duck Valley Reservation to recover damages for CSC underpayments during fiscal years 1996 and 1997, the same years at issue in this case. *Cherokee Nation, supra.* Although, as defendants repeatedly emphasize, the Tribes filed no petition for *certiorari* to the United States Supreme Court from the decision in *Shoshone–Bannock IV*, it is equally true that *Shoshone–Bannock IV* presented no conflict with other decisional law.

This court concludes that, when considered in combination, the unique trust relationship between the United States and the Tribes, the fact that the Shoshone–Bannock Tribes would be the only group denied full CSC payments out of some 300 tribes across the United States, the fact that this case presented no intercircuit conflict at the time of the decision in *Shoshone–Bannock IV*, the lack of prejudice to the Government, and the absence of any concerns about finality other than whether the Tribes will be paid their full CSCs, constitute extraordinary circumstances meriting relief from this court's previous judgment.

### ORDER

For the reasons stated above, Shoshone–Bannock Tribes' Motion for Relief from Judgment (docket # 180) is GRANTED.